[No. A131625. First Dist., Div. Two. Dec. 4, 2012.]

THE PEOPLE ex rel. DENNIS J. HERRERA, as City Attorney, etc.,
Plaintiff and Respondent, v.
CHRISTOPHER STENDER et al., Defendants and Appellants.

## COUNSEL

Henderson, Caverly, Pum & Charney, Kristen E. Caverly and Edgar H. Hayden, Jr., for Defendants and Appellants.

Dennis J. Herrera, City Attorney, Danny Chou, Chief of Complex and Special Litigation, Owen Clements, Chief of Special Litigation, Joshua White and Kristine Poplawski, Deputy City Attorneys, for Plaintiff and Respondent.

## OPINION

**KLINE, P. J.**—This appeal challenges a preliminary injunction requiring appellants, an immigration lawyer and law firm, to provide notice to certain clients that another lawyer who had been employed by the firm had resigned from the bar with disciplinary charges pending and was not authorized to practice law. Appellants contend the injunction should not have been granted because the statutes and rules they were alleged to have violated do not apply to them; the required notice was inaccurate and would cause harm to them and their clients; they were precluded from presenting evidence in their defense by their obligation not to violate attorney-client privilege and their clients' rights to privacy; and the events underlying the allegations against them were no longer occurring and unlikely to occur in the future. We will affirm.

## STATEMENT OF THE CASE AND FACTS

Martin Resendez Guajardo was the president, treasurer, secretary and sole shareholder of an immigration law practice originally named "Martin Resendez Guajardo, A Professional Corporation." In 2008, Guajardo resigned from the California State Bar with disciplinary charges pending,[1] making him ineligible to practice law, and Attorney Christopher Stender acquired the law practice. Stender became a shareholder, along with Guajardo, effective April 8, 2008. On April 14, 2008, Guajardo changed the name of the law firm to "Immigration Practice Group, P.C." (IPG). On April 16, 2008, the California State Bar certified that IPG was registered as a law corporation. Effective April 17, Stender replaced Guajardo as president, treasurer and secretary of IPG. Also on April 17, Guajardo's formal letter of resignation was filed with

---

[1] The disciplinary history reflected in the record dates to 1992, when the California Supreme Court ordered Guajardo suspended from practice for one year, with execution of suspension suspended, three years' probation and 75 days actual suspension, based upon his failure to file a brief in support of a client's petition for review with the Ninth Circuit Court of Appeals, which resulted in dismissal of the petition; failure to refund unearned fees to a client upon request; failure to take action on behalf of two other clients or refund their unearned fees; and failure to perfect two appeals in the Ninth Circuit, which resulted in Guajardo being suspended from practicing before that court. Guajardo had been suspended from practice before the Ninth Circuit in 1991, for six months, due to his neglect of clients and repeated failure to respond to the court's orders to show cause, and that court " 'invited' the State Bar of California to 'investigate [Mr. Guajardo's] misconduct.' " (*Gao-Ay v. INS* (9th Cir., Apr. 17, 1991, No. 90-70163) 1991 U.S.App. Lexis 8235, fn. 1.)

In 1993, Guajardo was suspended from practice by the California Supreme Court for one year, with execution of suspension suspended and an additional year of probation, consecutive to the previously imposed discipline, for failure to comply with conditions of probation requiring him to file quarterly reports and develop a law office management/organization plan. Guajardo was suspended from practice by the Ninth Circuit Court of Appeals in 1996 for failure to avoid and acknowledge conflicts of interest and continuing failure to abide by court orders and rules; the findings in this case formed the basis of another one-year suspension by the California Supreme Court in 1998, with execution of suspension stayed and one year of probation.

In 2006, the Ninth Circuit Court of Appeals ordered Guajardo to show cause why he should not be sanctioned, suspended or disbarred for repeated violations of the court's rules and orders and for conduct unbecoming a member of the court's bar. The court's order referred to numerous cases in which Guajardo violated court rules and failed to represent clients competently. On the day of the hearing, Guajardo filed his resignation from the Ninth Circuit Court of Appeals Bar. The court accepted his resignation in November 2007, imposed monetary sanctions for his admitted violations of the court's rules and orders, and imposed orders regarding his withdrawal from cases and from representation of clients. Later, Guajardo was suspended from practice before the Board of Immigration Appeals, the immigration courts and the Department of Homeland Security.

In 2007, the California State Bar brought new disciplinary charges against Guajardo based upon his failure to return unearned fees to clients, failure to perform legal services competently and charging of an unconscionable fee. These were the charges pending when Guajardo resigned from the bar in 2008.

the State Bar.[2] As of June 16, Stender became IPG's sole shareholder. Stender is a member of the state bars of New York and Connecticut and admitted to practice before the United States Court of Appeals for the Ninth Circuit and other federal courts; he is not a member of the California State Bar.

On November 17, 2010, the People of the State of California filed a complaint against Guajardo, Stender and IPG, alleging they engaged in unlawful, unfair and deceptive business practices in violation of Business and Professions Code[3] section 17200, based on Guajardo's unauthorized practice of law.[4] In essence, the complaint alleged that after his resignation from the bar, Guajardo continued his legal practice, aided and abetted by Stender and IPG; that defendants failed to give required notice to clients and other entities of Guajardo's resignation and the activities he was prohibited from performing, and affirmatively led clients to believe Guajardo was in charge of their cases; and that defendants engaged in unlawful acts related to fees and representation of clients in immigration matters.[5] The People urged that

---

[2] The California Supreme Court's order accepting Guajardo's resignation was filed on May 13, 2009.

[3] Further statutory references will be to the Business and Professions Code unless otherwise specified.

[4] Also on November 17, 2010, a lawsuit was filed against Guajardo, Stender and IPG by a number of former clients, represented by Orrick Herrington and Sutcliffe LLP. (*Hernandez v. Guajardo* (Super. Ct. S.F. City and County, No. CGC-10-505450).)

[5] Specifically, the complaint alleged that Guajardo violated sections 6180 and 6180.1, and rule 9.20(a)(1) of the California Rules of Court, by failing to provide clients written notification of his resignation to his clients, opposing counsel and courts and agencies in which he had matters pending; violated rule 9.20(c) by failing to file with the clerk of the State Bar an affidavit showing he had fully complied with rule 9.20(a)(1); violated sections 6125 and 6126 by practicing law without a license; and violated rule 9.20(a)(3) and State Bar Rules of Professional Conduct, rule 3-700(D)(2), by failing to refund unearned fees upon his resignation. It was alleged that Stender and IPG violated sections 6180 and 6180.1 by failing to provide written notice of Guajardo's resignation to clients, courts, agencies, insurers and the Office of the Chief Trial Counsel of the State Bar, and violated Rules of Professional Conduct, rule 1-311(D), by failing to provide written notice to the State Bar of their employment of Guajardo and to clients of the activities Guajardo was prohibited from performing; violated Rules of Professional Conduct, rules 1-311(D) and 1-311(F), by falsely informing the State Bar that Guajardo ceased to be employed by IPG as of April 17, 2008; violated section 6132 by failing to remove Guajardo's name from the firm's Web site within 60 days of his resignation; violated section 6133, 8 Code of Federal Regulations part 1003.102(m) (2012) and Rules of Professional Conduct, rule 1-300(A), by permitting Guajardo to practice law, failing to supervise him and aiding his unauthorized practice of law, and were liable for Guajardo's unlawful practice of law under the principles of respondeat superior; violated Corporations Code section 13408.5 and Rules of Professional Conduct, rules 1-320(A) and 2-200(A) by sharing fees with Guajardo; and violated Business and Professions Code section 22442.2, subdivision (c)(3) by failing to include in advertisements for immigration services that Stender is not licensed to practice in California but is authorized to represent persons before the Board of Immigration Appeals. It was further alleged that Guajardo, Stender and IPG violated Penal Code section 653.55 and 8 Code of Federal Regulations part 1003.102(f) (2012) by making

Guajardo, Stender and IPG were perpetuating a massive fraud, taking thousands of dollars under false pretenses from vulnerable and desperate immigrants in custody or facing imminent deportation and typically providing no services of value. The People sought relief including an order under sections 17203 and 17204 enjoining defendants from performing the unlawful acts described in the complaint and an injunction prohibiting them from continuing their unlawful and unfair activities and financial penalties. Citing the "imminent danger to the People each day Martin Guajardo continues to hold himself out as a lawyer, and Immigration Practice Group and Christopher Stender allow Guajardo to do so," the People sought an order to show cause regarding preliminary injunction.

In support of the application for a preliminary injunction, the People submitted declarations from a number of clients who worked with Guajardo after his April 17, 2008, resignation from the bar. Most of these clients had hired Guajardo prior to his resignation, but a few first hired him afterward. All continued to work with Guajardo in the belief he was their attorney after April 2008 and declared that neither Guajardo nor anyone at IPG told them Guajardo resigned from the bar and was not authorized to practice law. Maria Hernandez, who first met with Guajardo in June 2010, declared that Guajardo told her that he was the head of the firm and directed and supervised the lawyers, who followed his orders. When Jagdeep Singh asked after hearing in the community that Guajardo had been suspended, Guajardo said it was only a one-to-two-month suspension, Singh should not worry and "I'm still you're [*sic*] attorney and I'll take care of your case."

According to the clients' declarations, Guajardo ran the clients' meetings and was the one who discussed the case and legal strategy. Jaime Hernandez stated that in January 2009, Guajardo introduced him to Stender, saying he was retiring and transferring his practice to Stender, but Guajardo remained the only person who discussed Hernandez's case with him. Hernandez's son, who had been deported and whom Hernandez had hired Guajardo to help, spoke with Guajardo by phone every few months and formed the impression that Guajardo was the head of the office and had people, including Stender, working for him. Mynor Andrade declared that when the name of the practice changed to IPG, Guajardo stopped signing the correspondence Andrade received and most of the staff changed; Guajardo introduced Stender and Martin Robles and told Andrade his firm had merged with Stender's and there would now be a team of lawyers working on the case. When Andrade asked who was his lawyer, Stender pointed at Guajardo and said, " 'He's still your guy. We're

false statements to clients about Guajardo's authority to practice law, violated Business and Professions Code section 6148 by failing to provide clients with written contracts when it was reasonably foreseeable the client's expenses would exceed $1,000, and violated Civil Code section 1632, subdivision (b)(6) by failing to provide Spanish-speaking clients with contracts translated into Spanish.

just here to help.' " Subsequently, Guajardo's treatment of Stender led Andrade to believe Stender was Guajardo's subordinate. Magnolia Martinez declared that Guajardo acted like the head of the office, giving orders to other employees and attorneys. Denise Escober stated that Guajardo gave orders to employees while Stender seemed more like a secretary than a lawyer. A law student who accompanied one of the clients to a meeting with Guajardo declared that he ran the meeting and gave orders to staff, including orders to implement a legal strategy he came up with. Clients observed that Guajardo was always busy with other clients when they went to see him.

The clients' declarations also described Guajardo taking substantial sums of money but providing little in services. Maria Hernandez stated that after Guajardo promised to get her daughter out of detention and obtain legal status for her, and collected $5,000, no one from the office ever talked to the daughter or assisted at her immigration interview or hearing, and the daughter was deported. Jagdeep Singh terminated his relationship with Guajardo after three years, having paid $95,000, because Guajardo made promises but did nothing on his case. Guajardo told Balbir Singh it would cost $15,000 for him to get Singh a green card and Singh had paid $5,000 by the time he discovered Guajardo was not licensed and consulted another attorney. Singh was not aware of Guajardo or anyone at the firm having filed any document on his behalf. Jaime Hernandez described the unsuccessful actions Guajardo's firm took on his son's case and stated that an attorney he subsequently contacted filed a successful motion to reopen based on Stender having provided ineffective assistance of counsel. Mynor Andrade and his family paid Guajardo $20,000 to obtain his and his brother's release from immigration custody, then an additional $19,500 on Guajardo's assertion that he could obtain permanent resident status for the brothers. Guajardo continually assured Andrade he would be successful, but the motions and petitions Guajardo, Stender and another IPG attorney filed on Andrade's behalf were unsuccessful and an attorney Andrade subsequently consulted told him at least one of these petitions had little or no chance of success. Denise Escober paid Guajardo $35,000 to $40,000 to help her husband obtain a green card and Guajardo told them he would file a document that would guarantee her husband could stay in the United States for another three to five years, but her husband was deported a year later.

Additionally, the clients declared that they discussed legal fees with Guajardo and paid him directly. Several clients stated that after they fired Guajardo, the files returned to them were incomplete.

The trial court filed its order to show cause on November 22, 2010, setting the matter for December 21, 2010. Efforts to personally serve Guajardo were unsuccessful.

On December 13, Stender and IPG filed a notice of removal of action to federal court on the ground that the case involved a federal question—the regulation of attorneys and practitioners in federal courts and federal immigration courts and administrative agencies. The action was remanded to state court on January 7, 2011.

Stender and IPG then filed objections to the People's evidence in support of the application for a preliminary injunction, together with documents including letters attesting to Stender's character and legal skill, and declarations stating that Guajardo did not work as an attorney for IPG and clients were informed that they were represented by other IPG attorneys.

Two attorneys who worked for Guajardo's law office and then for IPG, Teresa Salazar-Cosmos and Martin Robles-Avila, declared that they worked with clients directly without Guajardo being present and, when Guajardo was at client meetings, he told the clients that he was not their attorney and that one of the IPG attorneys present was their counsel. Robles-Avila stated that Guajardo often told his former clients that he had sold the firm to Stender and was no longer representing the clients. In early October 2010, Guajardo told Salazar-Cosmos he was leaving IPG and moving away from San Francisco; she had not seen him since. Robles-Avila, who left IPG in April 2010 and moved to Los Angeles, had not seen any member of the Guajardo family since May 2010.

Stender's declaration described his legal career and stated that he had a good reputation and had never been suspended, sanctioned, reprimanded, or convicted of any felony or State Bar violation. He was a resident of San Diego County and a partner in the law firm of Stender & Lappin, P.C., Attorneys at Law, with offices in San Diego and Phoenix.

Stender stated that IPG hired Guajardo to "help in the transition of the previous client files and case histories of those clients, to offer to the attorney staff of IPG his information, knowledge, research and experience in immigration matters, and to offer updates on client files as he was assisting the IPG attorney." According to Stender, Guajardo was not hired as an attorney or authorized to engage in activities that might constitute the practice of law, and clients were advised that Guajardo was not an attorney. Stender declared that the People's declarants were advised that Guajardo did not represent them and that Stender or other attorneys in the office were handling their files. It was IPG's policy, and to Stender's knowledge its practice, not to have Guajardo meet with any client privately, or without an IPG licensed attorney present when any client information was being discussed, and to Stender's knowledge, Guajardo never met with any client without one of the IPG

attorneys present while discussing client information. This policy was enforced in general and in particular with each of the persons whose declarations were submitted by the People. Stender stated that there had never been any determination that unearned fees were charged to these declarants and there were clear instructions that Guajardo was not to handle fees from IPG clients. IPG attorneys did not take orders or directives from Guajardo. Guajardo's association with Stender and IPG ended in October 2010, when Guajardo left the firm and told Stender he had moved out of San Francisco; Stender had not seen Guajardo at his offices since, and did not know his whereabouts.

Stender further declared that prior to the filing of the complaint, he had no notice that there were any complaints about IPG employing Guajardo and no official agency had informed him or IPG that it believed any of the alleged violations were occurring. Soon after the city attorney's press conference about this case on November 17, 2010, the attorneys and most of the support staff left IPG, leaving Stender as the only attorney. IPG closed its office at 555 Clay Street, vacated the premises, and ceased active operation as a law firm after December 15, 2010. Since then, Stender had been working with former IPG clients to ensure they were represented by other attorneys or by Stender's immigration law firm.[6] None of the attorneys representing the former IPG clients employed Guajardo, and neither Stender, his law firm nor any attorney associated with him intended to have any future association with Guajardo in any capacity.

According to Stender, because Guajardo was no longer associated with IPG or its clients and Stender and his associates had no intent to associate with Guajardo in any way, there was no possibility of continuing harm that would justify the requested preliminary injunction. Stender urged that the notices the People requested to be posted or sent to present clients would "have an irreparable and chilling effect on their cases, especially in that many would wish not to give any information to any agency that may be able to prosecute them or that might have the ability to forward information to the Department of Homeland Security, or that becomes available to other prosecuting offices to review." According to Stender, "[a]ll information concerning a client's name, address, etc. would divulge their whereabouts to Immigration and Customs Enforcement" and any act that caused him or his firm "to make such information available would, in effect, place me in an impossible ethical dilemma and cause the practical effect of preventing me from the practice of law for my clients," causing irreparable harm to him and his clients.

---

[6] A form letter from Stender's law firm, Stender & Associates, P.C., informed clients that IPG was closing and client files would be transferred to Stender & Associates, and requested clients' authorization for the transfer of files. The record contains no information as to which clients received this notice or returned signed authorizations.

Stender's declaration also responded to the declarations of the former clients, although Stender noted that he could not "fully respond" without violating attorney-client privilege. In essence, Stender stated that actions attributed to Guajardo were in fact taken by licensed IPG attorneys, as evidenced, for example, by pleadings and other documents signed by those attorneys; that the clients were informed of Guajardo's inability to practice law; that Guajardo did not run client meetings or direct other attorneys; and that fees were paid to IPG, not Guajardo. Stender stated it was IPG's practice to provide all clients with a copy of the March 5, 2008, order suspending Guajardo from practice before the Board of Immigration Appeals, the immigration courts and the Department of Homeland Security. Appellants submitted copies of the March 5, 2008, order signed by several of the declarant clients in April and May 2008.

In response to appellants' showing, two of the clients whose signatures appear on copies of the March 8 order stated that they recognized their signatures but did not recall signing the document or having it explained to them. Ledezma-Galvan stated that she is unable to read, write or speak English and until the document was translated for her in 2011, no one had ever translated or explained its contents to her. Andrade stated that Guajardo would give him several documents to sign at one time, explaining generally that they would be filed with the immigration service or the court but not reviewing each document separately. Jagdeep Singh's wife declared that the document was not explained to him at any time when she was present, and that he was often given multiple documents to sign without the documents being individually explained.

Richard Kung, an investigator for the San Francisco City Attorney's Office, called IPG on November 9, 2010, in an effort to determine whether it would be possible to serve Guajardo at the office. He asked for an appointment with Guajardo and was told there was no appointment available on the date he requested but one could be scheduled on a different date. He was not told that Guajardo had left IPG. On November 17, Kung went to the IPG offices, asked for Guajardo and was told he was not in and would not return for months but Kung could talk with Guajardo's wife. Kung left the summons and complaint with a man who introduced himself as the office secretary. Two days later, when Kung returned and asked for Guajardo, he was told Guajardo was not in but was not told he was no longer associated with the firm. Later that day, Kung returned and asked for Guajardo again, and was told Guajardo would return to the office in three weeks.

The hearing on the motion for a preliminary injunction was held on March 7, 2011. The court found that the People had established a likelihood of success on the merits, as least with respect to failures to properly notify

clients of Guajardo's resignation, and that the balance of prejudices supported issuing the injunction. After going through the specific language of the proposed injunction and ordering certain modifications, the court directed the People to submit a revised order for its signature. At Stender's request, the court ordered a stay for 10 days following the entry of the order.

On March 16, the People filed notice of ex parte application for a signed order, stating the parties had been unable to agree on modifications that Stender proposed and the People maintained should have been raised at the March 7 hearing. The order granting the preliminary injunction was filed on March 17. The court found that the People had presented sufficient evidence they would likely prevail on the merits of their claims that IPG is bound by the same Rules of Professional Conduct as individual members of the bar; that IPG violated Rules of Professional Conduct, rule 1-311(D),[7] by failing to provide the State Bar with written notice that it employed a resigned member and acknowledgment that Guajardo would not engage in prohibited activities; that IPG violated sections 6180 and 6180.1 by failing to provide notice of Guajardo's resignation to Guajardo's clients, opposing counsel, courts and agencies in which Guajardo had pending matters or the chief counsel of the State Bar; that IPG violated rule 1-311(D) by failing to provide each client whose case Guajardo worked on with written notice of its employment of a resigned member and of the activities in which that person was prohibited from engaging; that IPG violated rule 1-300(A), sections 6125, 6126 and 6133, and 8 Code of Federal Regulations part 1003.102(m) (2012) by aiding and abetting Guajardo's unauthorized practice of law; and that IPG violated Penal Code section 653.55 and 8 Code of Federal Regulations part 1003.102(f) (2012) by failing to inform Guajardo's clients that he was no longer an attorney and inducing clients to rely upon Guajardo for legal advice and representation. The court found sufficient evidence that the People would likely prevail on their claims that Stender controlled the business practices of IPG and its employees and associated attorneys; that Stender engaged in unlawful and unfair business practices in violation of section 17200 by causing IPG to fail to provide written notice to the State Bar of its employment of a resigned member and to acknowledge that Guajardo would not engage in prohibited activities, in violation of rule 1-311(D), failing to provide notice of Guajardo's resignation to his clients, opposing counsel, courts and agencies in which he had pending matters, or the chief counsel of the State Bar, in violation of sections 6180 and 6180.1, and failing to provide each client on whose case Guajardo worked written notice of its employment of a resigned member, in violation of rule 1-311(D); that Stender aided and abetted Guajardo's unauthorized practice of law in violation of rule 1-300(A), sections 6133, 6125 and 6126, and 8 Code of Federal Regulations part

---

[7] All further references to rules will be to the State Bar Rules of Professional Conduct unless otherwise specified.

1003.102(m) (2012); and that Stender violated Penal Code section 653.55 and 8 Code of Federal Regulations part 1003.102(f) (2012) by failing to inform Guajardo's clients that he was no longer an attorney and inducing Guajardo's clients to rely on him for legal advice and representation.

The court found the preliminary injunction necessary "to protect individuals in need of legal advice from seeking assistance from Martin R. Guajardo in the mistaken belief that he is a licensed attorney," to "ensure that Defendants Stender, and IPG comply with their obligations to notify clients that Guajardo is no longer licensed to practice law," and to "ensure that IPG and Stender no longer aid and abet the unauthorized practice of law by Guajardo."

The injunction required Stender and IPG to provide two copies of a specified notice to all clients[8] by first-class mail within 30 days of the date of the order, together with a self-addressed stamped envelope, and to keep all returned copies of the notice until one year after the conclusion of the litigation. The notice states in large, boldface type that Guajardo is not a lawyer, describes the circumstances of his resignation, lists six actions Guajardo is prohibited from taking on the client's behalf, and advises the client of his or her right to fire Guajardo and secure return from him and IPG of all unearned fees and the client's entire case file. The notice states that the San Francisco Superior Court has ordered Stender and IPG to send it and asks the client to sign and return to IPG a verification that he or she understands that Guajardo is not a lawyer and may not help with his or her legal case.[9] The order requires Stender and IPG to obtain translations of the

---

[8] The order defines "clients" as all former clients of Guajardo, or current or former clients of IPG and Stender on whose cases Guajardo worked, who, on or since April 17, 2008, gave money for legal services while at 555 Clay Street, signed attorney-client agreements with IPG or any of its employees, agents, servants and representatives, received legal advice from any individual at IPG, had any document filed on their behalf with any court by IPG or any of its employees, agents, servants, and representatives, are on any client list maintained by Guajardo, Stender and/or IPG, were sent promotional materials by Guajardo, Stender and/or IPG, signed retainer agreements with or paid money for legal services to or received advice from IPG or any of its employees, agents, servants and representatives, and were being represented by Guajardo, IPG or any of its employees, agents, servants and representatives before any court or government agency.

[9] The required notice reads as follows:

"This is a notice that the San Francisco Superior Court has ordered Christopher J. Stender and the Immigration Practice Group to send to you:

## "MARTIN R. GUAJARDO IS NOT A LAWYER

"He has not been a lawyer since April 17, 2008. He resigned from the State Bar during an investigation into multiple allegations of misconduct, including ineffective representation and charging excessive legal fees. To learn more about Mr. Guajardo, go to this website: http://members.calbar.ca.gov/fal/Member/Detail/75605

notice into Spanish, Hindi and Chinese by court-certified translators, within 15 days of the date of the order, and include these translations in the mailings to clients; to make reasonable efforts to locate and resend the notice to any client whose notice is returned as undeliverable; within 15 days of the order, to personally hand the notice to clients who meet with Stender or any associated attorney, and, within five days of the order, to remove Guajardo's name from all advertising and promotional material used by IPG. The order further directs IPG and Stender to immediately cease and desist from assisting Guajardo in the unauthorized practice of law, to not allow Guajardo to meet alone with persons seeking legal advice or to engage in the unauthorized practice of law, and, in the event of a client terminating his or her relationship with IPG, Stender or Guajardo, to return the client's entire file within two weeks, including all original documents and photographs.

Stender and IPG filed a timely notice of appeal on March 25, 2011.

## DISCUSSION

Appellants contend the injunction was moot when issued because Guajardo had left IPG and IPG had ceased operations, and the notice required by the injunction would irreparably harm IPG, Stender and their clients. Additionally, appellants argue the injunction should not have been issued because IPG and Stender were ethically precluded from presenting evidence in their defense by their obligation to maintain their clients' privacy and attorney-client privilege. Finally, appellants maintain that the injunction was improperly based upon alleged violations of the California State Bar Rules of Professional Conduct, which should be enforced through the court's regulatory systems rather than the unfair competition law (UCL).

" 'The law is well settled that the decision to grant a preliminary injunction rests in the sound discretion of the trial court.' (*IT Corp.* v. *County of Imperial* (1983) 35 Cal.3d 63, 69 [196 Cal.Rptr. 715, 672 P.2d 121].) 'A trial court will be found to have abused its discretion only when it has " 'exceeded the bounds of reason or contravened the uncontradicted evidence.' " ' (*Ibid.*)

---

"Because Mr. Guajardo is not a lawyer, there are many things that it is illegal for him to do:
"—He cannot give legal advice or discuss your legal case.
"—He cannot represent you in your immigration case or in any kind of legal case.
"—He cannot get you a green card.
"—He cannot get you legal status in the United States.
"—He cannot give orders to lawyers about how to handle a case.
"—He cannot accept any money from you.
"If Mr. Guajardo has been acting as your lawyer, you are free to fire him and get a licensed attorney to represent you. If you choose to do so, Mr. Guajardo and IPG <u>must</u> immediately return to you all unearned fees, if any, and your entire case file, including all original documents."

'Further, the burden rests with the party challenging the [trial court's ruling on the application for an] injunction to make a clear showing of an abuse of discretion.' (*Ibid.*)

■ " '[T]rial courts should evaluate two interrelated factors when deciding whether or not to issue a preliminary injunction. The first is the likelihood that the plaintiff will prevail on the merits at trial. The second is the interim harm that the plaintiff is likely to sustain if the injunction were denied as compared to the harm that the defendant is likely to suffer if the preliminary injunction were issued.' (*IT Corp.* v. *County of Imperial, supra,* 35 Cal.3d at pp. 69–70.)

"An appeal from an order granting a preliminary injunction involves a limited review of these two factors—likelihood of success on the merits and interim harm. If the trial court abused its discretion on either factor, we must reverse. (*Carsten* v. *City of Del Mar* (1992) 8 Cal.App.4th 1642, 1649 [11 Cal.Rptr.2d 252].)" (*Shoemaker* v. *County of Los Angeles* (1995) 37 Cal.App.4th 618, 624–625 [43 Cal.Rptr.2d 774] (*Shoemaker*).)

On appeal, we do not reweigh conflicting evidence or assess the credibility of witnesses; we only determine whether, interpreting the facts in the light most favorable to the prevailing party and indulging all reasonable inferences in favor of the trial court's order, the trial court's factual findings are supported by substantial evidence. (*Shoemaker, supra,* 37 Cal.App.4th at p. 625.) With respect to the construction of statutes, however, our standard of review is de novo. (*Davenport* v. *Blue Cross of California* (1997) 52 Cal.App.4th 435, 445 [60 Cal.Rptr.2d 641].)

■ " 'Where, as here, the preliminary injunction mandates an affirmative act that changes the status quo, we scrutinize it even more closely for abuse of discretion. "The judicial resistance to injunctive relief increases when the attempt is made to compel the doing of affirmative acts. A preliminary mandatory injunction is rarely granted, and is subject to stricter review on appeal." ' (*Board of Supervisors* v. *McMahon* (1990) 219 Cal.App.3d 286, 295 [268 Cal.Rptr. 219], fn. omitted.) The granting of a mandatory injunction pending trial ' "is not permitted except in extreme cases where the right thereto is clearly established." ' (*Ibid.,* quoting *Hagen* v. *Beth* (1897) 118 Cal. 330, 331 [50 P. 425].)" (*Shoemaker, supra,* 37 Cal.App.4th at p. 625.)

■ Additionally, "[i]njunctive relief is appropriate only when there is a threat of continuing misconduct." (*Madrid* v. *Perot Systems Corp.* (2005) 130 Cal.App.4th 440, 463 [30 Cal.Rptr.3d 210].) "[T]he general rule is that an injunction may not issue unless the alleged misconduct is ongoing or likely to recur. . . . [¶] 'Injunctive relief has no application to wrongs which have been

completed [citation], absent a showing that past violations will probably recur. [Citation.]' (*People v. Toomey* [(1984)] 157 Cal.App.3d [1,] 20 [203 Cal.Rptr. 642].)" (*Madrid v. Perot Systems Corp., supra*, 130 Cal.App.4th at pp. 464–465.) ■ Thus, while a trial court has broad authority to enjoin conduct that violates section 17200, "in order to grant injunctive relief under section 17204 . . . , there must be a threat that the wrongful conduct will continue. 'Injunctive relief will be denied if, at the time of the order of judgment, there is no reasonable probability that the past acts complained of will recur, i.e., where the defendant voluntarily discontinues the wrongful conduct.' (*California Service Station etc. Assn. v. Union Oil Co.* [(1991)] 232 Cal.App.3d [44,] 57 [283 Cal.Rptr. 279]; see *Feitelberg v. Credit Suisse First Boston, LLC* [(2005)] 134 Cal.App.4th [997,] 1012 [36 Cal.Rptr.3d 592] [under § 17203, the ' "injunctive remedy should not be exercised 'in the absence of any evidence that the acts are likely to be repeated in the future' " ']; Stern, Bus. & Prof. C. § 17200 Practice [(The Rutter Group 2005)] ¶ 2:36, p. 2-10.)" (*Colgan v. Leatherman Tool Group, Inc.* (2006) 135 Cal.App.4th 663, 702 [38 Cal.Rptr.3d 36], fn. omitted.)

"Finally, our decision does not constitute a final adjudication of the ultimate rights in controversy. (See *Cohen v. Board of Supervisors* (1985) 40 Cal.3d 277, 286 [219 Cal.Rptr. 467, 707 P.2d 840]; *Wilkinson v. Times Mirror Corp.* (1989) 215 Cal.App.3d 1034, 1039–1040 [264 Cal.Rptr. 194].) In reviewing the propriety of a ruling on an application for a preliminary injunction, we merely decide whether the trial court abused its discretion based on the record before it at the time of the ruling." (*Shoemaker, supra*, 37 Cal.App.4th at pp. 625–626.)

## I.

Appellants argue that the injunction should not have been granted because it was based upon alleged violations of statutes and regulations that do not apply to them and constitutes an improper attempt to regulate a law practice. With respect to appellants, the unlawful practices alleged under section 17200 included violations of provisions of the State Bar Act (§§ 6180, 6180.1, 6132, 6133), Rules of Professional Conduct (rules 1-300(A), 1-311(B), 1-311(D), 1-311(F), 1-320(A) & 2-200(A)), federal regulations (8 C.F.R. §§ 1003.102(f), 1003.102(m) (2012)) and Penal Code section 653.55.

■ Appellants urge that violations of the Rules of Professional Conduct do not support a cause of action. Rule 1-100(A) provides that the rules "are intended to regulate professional conduct of members of the State Bar through discipline" and "are not intended to create new civil causes of action. Nothing in these rules shall be deemed to create, augment, diminish, or eliminate any substantive legal duty of lawyers or the non-disciplinary

consequences of violating such a duty." Accordingly, violation of a rule of professional conduct cannot, in and of itself, serve as the basis for a damages award. (*Conservatorship of Becerra* (2009) 175 Cal.App.4th 1474, 1484 [96 Cal.Rptr.3d 910]; *Ross v. Creel Printing & Publishing Co.* (2002) 100 Cal.App.4th 736, 746 [122 Cal.Rptr.2d 787]; *Mirabito v. Liccardo* (1992) 4 Cal.App.4th 41, 46 [5 Cal.Rptr.2d 571].) Violation of the rules can be used, however, to establish a breach of fiduciary duty. (*Stanley v. Richmond* (1995) 35 Cal.App.4th 1070, 1097 [41 Cal.Rptr.2d 768]; *Mirabito v. Liccardo, supra,* 4 Cal.App.4th at pp. 45–46.) Similarly, here, the complaint does not allege any independent cause of action for breach of a rule of professional conduct. Rather, the complaint alleges unlawful business practices under section 17200, using violation of the Rules of Professional Conduct as a measure of the unlawful practice. (See *Mirabito v. Liccardo, supra,* 4 Cal.App.4th at p. 46.) ■ It is well established that a section 17200 claim may be based on violation of a statute that the plaintiff could not directly enforce with a private action. (*Stop Youth Addiction, Inc. v. Lucky Stores, Inc.* (1998) 17 Cal.4th 553, 562 [71 Cal.Rptr.2d 731, 950 P.2d 1086].)

■ Appellants further urge that the injunction cannot be based upon violation of the State Bar rules because neither Stender nor IPG is a member of the State Bar. IPG, however, is a registered California law corporation. Section 6167 provides: "A law corporation shall not do or fail to do any act the doing of which or the failure to do which would constitute a cause for discipline of a member of the State Bar, under any statute, rule or regulation now or hereafter in effect: In the conduct of its business, it shall observe and be bound by such statutes, rules and regulations to the same extent as if specifically designated therein as a member of the State Bar." Appellants view section 6167 as solely a rule for discipline that does not make the corporation a member of the State Bar. In a different context, the Attorney General has taken the opposite view. Opining that a law corporation is exempt from a requirement to register as a tax preparer from which a member of the State Bar would be exempt, the Attorney General stated, "Since section 6167 specifically designates law corporations as members of the State Bar and inasmuch as law corporations are registered with the State Bar and are entitled thereby to practice law it is concluded that a law corporation is a 'member of the State Bar' within the meaning of section 9891.2 subd. (b) and is exempt from registration as a tax preparer." (58 Ops.Cal.Atty.Gen. 665, 668 (1975).) The logic expressed in this opinion holds in the present context as well. As a law corporation entitled to practice law in California, IPG is bound to adhere to the rules an individual member of the bar would be required to follow.

Appellants offer *Olson v. Cohen* (2003) 106 Cal.App.4th 1209 [131 Cal.Rptr.2d 620] as supporting their position that IPG could not violate a State Bar rule because it was not a member of the California State Bar and

not subject to discipline for violating such a rule. *Olson* upheld the dismissal of a suit under the UCL in which clients sought disgorgement of fees from a law corporation that had failed to register with the State Bar as required by law. Appellants emphasize the *Olson* court's statement that "[i]ncorporation is not undertaken for the protection of clients" and that failure to comply with laws governing incorporation of law corporations "may result in an order to cease and desist or suspension or revocation of registration." (106 Cal.App.4th at p. 1215.) The situation in *Olson*, however, bears little resemblance to the present case. There, the corporation registered before the complaint was filed and there were no allegations that clients had relied upon the corporate form in seeking legal services or been injured by the corporation's delay in registering. (*Id.* at p. 1214.) Here, respondents are not attempting to use the UCL to remedy a technical violation of the laws governing the corporate structure but rather to remedy an alleged fraud committed by the corporation and its officers and employees.

 ■ Rule 1-311 prohibits a bar member from employing a resigned (or disbarred, suspended, or involuntarily inactive) bar member to provide legal services for clients (rule 1-311(B)) but permits the employment of a resigned member to perform specified nonlegal and preparatory activities (rule 1-311(C)). In the event of such employment, the bar member is required to notify the State Bar, and each client upon whose matter the employee will work, of the employee's current bar status, and state that the employee will not perform the prohibited activities. (Rule 1-311(D).)[10] Under section 6167,

---

[10] Rule 1-311 provides as follows:

"(A) For purposes of this rule:

"(1) 'Employ' means to engage the services of another, including employees, agents, independent contractors and consultants, regardless of whether any compensation is paid;

"(2) 'Involuntarily inactive member' means a member who is ineligible to practice law as a result of action taken pursuant to Business and Professions Code *sections 6007, 6203(c)*, or California Rule of Court 9.31; and

"(3) 'Resigned member' means a member who has resigned from the State Bar while disciplinary charges are pending.

"(B) A member shall not employ, associate professionally with, or aid a person the member knows or reasonably should know is a disbarred, suspended, resigned, or involuntarily inactive member to perform the following on behalf of the member's client:

"(1) Render legal consultation or advice to the client;

"(2) Appear on behalf of a client in any hearing or proceeding or before any judicial officer, arbitrator, mediator, court, public agency, referee, magistrate, commissioner, or hearing officer;

"(3) Appear as a representative of the client at a deposition or other discovery matter;

"(4) Negotiate or transact any matter for or on behalf of the client with third parties;

"(5) Receive, disburse or otherwise handle the client's funds; or

"(6) Engage in activities which constitute the practice of law.

"(C) A member may employ, associate professionally with, or aid a disbarred, suspended, resigned, or involuntarily inactive member to perform research, drafting or clerical activities, including but not limited to:

IPG is required to adhere to these rules. Consequently, IPG can be prosecuted for violation of the rules as an unlawful practice under the UCL. Stender, as the sole shareholder, director, president, treasurer and secretary of IPG, necessarily controlled IPG's practices in general and, in particular, the information it gave to the State Bar and to its clients, about Guajardo's status and practice. By virtue of his direct participation in these practices, Stender can be found liable for IPG's unlawful business practices. (*People v. Toomey, supra,* 157 Cal.App.3d at pp. 14–16 [president and operating officer of corporation could be held liable for unlawful conduct of corporate employees where evidence showed he "orchestrated all aspects of the business" and had "unbridled control over the practices which were found violative of section 17200 and 17500"].)

■ Appellants' argument that they cannot be liable for violating sections 6180 and 6180.1 is no more tenable. Section 6180 provides: "When an attorney engaged in law practice in this state dies, resigns, becomes an inactive member of the State Bar, is disbarred, or is suspended from the active practice of law and is required by the order of suspension to give notice of the suspension, notice of cessation of law practice shall be given and the courts of this state shall have jurisdiction, as provided in this article." Section 6180.1 specifies the required contents and recipients of the notice, and provides that in cases other than death or incompetency of the attorney,

"(1) Legal work of a preparatory nature, such as legal research, the assemblage of data and other necessary information, drafting of pleadings, briefs, and other similar documents;

"(2) Direct communication with the client or third parties regarding matters such as scheduling, billing, updates, confirmation of receipt or sending of correspondence and messages; or

"(3) Accompanying an active member in attending a deposition or other discovery matter for the limited purpose of providing clerical assistance to the active member who will appear as the representative of the client.

"(D) Prior to or at the time of employing a person the member knows or reasonably should know is a disbarred, suspended, resigned, or involuntarily inactive member, the member shall serve upon the State Bar written notice of the employment, including a full description of such person's current bar status. The written notice shall also list the activities prohibited in paragraph (B) and state that the disbarred, suspended, resigned, or involuntarily inactive member will not perform such activities. The member shall serve similar written notice upon each client on whose specific matter such person will work, prior to or at the time of employing such person to work on the client's specific matter. The member shall obtain proof of service of the client's written notice and shall retain such proof and a true and correct copy of the client's written notice for two years following termination of the member's employment with the client.

"(E) A member may, without client or State Bar notification, employ a disbarred, suspended, resigned, or involuntarily inactive member whose sole function is to perform office physical plant or equipment maintenance, courier or delivery services, catering, reception, typing or transcription, or other similar support activities.

"(F) Upon termination of the disbarred, suspended, resigned, or involuntarily inactive member, the member shall promptly serve upon the State Bar written notice of the termination."

"the notice shall be given by the attorney or a person authorized by the attorney or by the person having custody and control of the files and records."[11] Appellants maintain that these statutes apply only to the attorney who resigns (here, Guajardo) and only when there is an order or other requirement of the State Bar (which they say did not occur here), and that the statutes do not apply to corporations. As we have said, section 6167 ensures that these rules *do* apply to law corporations, and section 6180.1 expressly requires that the notice be given by the resigning attorney *or* "the person having custody and control of the files and records." In the present case, the latter phrase necessarily applies to IPG and Stender.

Appellants' suggestion that no notice was required because the Supreme Court did not order Guajardo to provide notice of his resignation is entirely unpersuasive. Guajardo's resignation letter stated, "I further agree that within **thirty (30) days** of the filing of this resignation by the Office of the Clerk, State Bar Court, I shall perform the acts specified in Rule 9.20(a) and (b), California Rules of Court; and within **forty (40) days** of the date of filing of this resignation by the Office of the Clerk, State Bar Court, I shall notify that Office as specified in Rule 9.20(c), California Rules of Court." California Rules of Court, rule 9.20(a), provides that the Supreme Court "may include in an order disbarring or suspending a member of the State Bar, or accepting his or her resignation, a direction that the member must" perform specified actions, including notifying clients, cocounsel and opposing counsel or parties, returning clients' files and property, and refunding unearned fees.[12]

---

[11] Section 6180.1 provides in full: "The notice shall contain any information that may be required by any order of disbarment, suspension, or of acceptance of the attorneys' resignation, by any rule of the Supreme Court, Judicial Council, or the State Bar, and by any order of a court of the state having jurisdiction pursuant to this article or Article 12 (commencing with Section 6190) of this chapter. It shall be mailed to all persons who are then clients, to opposing counsel, to courts and agencies in which the attorney then had pending matters with an identification of the matter, to any errors and omissions insurer, to the Office of the Chief Trial Counsel of the State Bar and to any other person or entity having reason to be informed of the death, change of status or discontinuance or interruption of law practice. In the event of the death or incompetency of the attorney, the notice shall be given by the personal representative or guardian or conservator of the attorney or, if none, by the person having custody or control of the files and records of the attorney. In other cases, the notice shall be given by the attorney or a person authorized by the attorney or by the person having custody and control of the files and records."

[12] California Rules of Court, rule 9.20(a) provides in full:

"**(a) Disbarment, suspension, and resignation orders**

"The Supreme Court may include in an order disbarring or suspending a member of the State Bar, or accepting his or her resignation, a direction that the member must, within such time limits as the Supreme Court may prescribe:

"(1) Notify all clients being represented in pending matters and any co-counsel of his or her disbarment, suspension, or resignation and his or her consequent disqualification to act as an attorney after the effective date of the disbarment, suspension, or resignation, and, in the absence of co-counsel, also notify the clients to seek legal advice elsewhere, calling attention to any urgency in seeking the substitution of another attorney or attorneys;

California Rules of Court, rule 9.20(b) requires that "notices required by an order of the Supreme Court or the State Bar Court under this rule" be given by registered or certified mail, return receipt requested, and contain an address where communications may be directed to the resigned member.

■ Appellants take the view that neither they nor Guajardo was required to provide the notice described in California Rules of Court, rule 9.20, because the Supreme Court's order accepting Guajardo's resignation did not expressly order compliance with rule 9.20 and the rule requires notice only if the Supreme Court so orders. This view is based on the rule's provision that the Supreme Court "may" include the specified actions in its order accepting a member's resignation. But Guajardo's letter of resignation, in compliance with California Rules of Court, rule 9.21, expressly stated his agreement to "perform the acts specified in Rule 9.20(a) and (b)." The "acts specified in Rule 9.20(a) and (b)" are the notices, return of property and refund of unearned fees listed therein. The Supreme Court's acceptance of Guajardo's resignation required him to comply with the conditions upon which it was based, and obviated the need for the order to state that compliance with California Rules of Court, rule 9.20 was required. Moreover, California Rules of Court, rule 9.21, which specifically governs resignations of bar members with disciplinary charges pending, independently requires such a bar member to "perform the acts specified in rule 9.20(a)(1)–(4) and (b)." (Cal. Rules of Court, rule 9.21(a).)[13] Failure to "perform the acts

"(2) Deliver to all clients being represented in pending matters any papers or other property to which the clients are entitled, or notify the clients and any co-counsel of a suitable time and place where the papers and other property may be obtained, calling attention to any urgency for obtaining the papers or other property;

"(3) Refund any part of fees paid that have not been earned; and

"(4) Notify opposing counsel in pending litigation or, in the absence of counsel, the adverse parties of the disbarment, suspension, or resignation and consequent disqualification to act as an attorney after the effective date of the disbarment, suspension, or resignation, and file a copy of the notice with the court, agency, or tribunal before which the litigation is pending for inclusion in the respective file or files."

[13] California Rules of Court, rule 9.21(a), permits a State Bar member against whom disciplinary charges are pending to "tender a written resignation from membership in the State Bar and relinquishment of the right to practice law. The written resignation must be signed and dated by the member at the time it is tendered and must be tendered to the Office of the Clerk, State Bar Court, 1149 South Hill Street, Los Angeles, California 90015. The resignation must be substantially in the form specified in (b) of this rule. In submitting a resignation under this rule, a member of the State Bar agrees to be transferred to inactive membership in the State Bar effective on the filing of the resignation by the State Bar. Within 30 days after filing of the resignation, the member must perform the acts specified in rule 9.20(a)(1)–(4) and (b) and within 40 days after filing of the resignation, the member must file with the Office of the Clerk, State Bar Court, at the above address, the proof of compliance specified in rule 9.20(c). No resignation is effective unless and until it is accepted by the Supreme Court after consideration and recommendation by the State Bar Court."

specified in rule 9.20(a) . . . and (b)" is one of the grounds upon which the Supreme Court may reject a resignation, forcing the member to proceed with the disciplinary action.[14]

 In addition to the notice issues, appellants challenge the trial court's findings that they aided and abetted Guajardo's unauthorized practice of law as lacking both factual and legal support. The trial court found that IPG and Stender aided and abetted Guajardo's unauthorized practice of law in violation of rule 1-300(A), sections 6125, 6126 and 6133, and 8 Code of Federal Regulations part 1003.102(m) (2012). Section 6125 prohibits the practice of law in California by anyone who is not an active member of the State Bar, section 6126 sets forth the criminal penalties for violating this prohibition,[15] and rule 1-300(A) prohibits bar members from aiding any person or entity in

---

[14] Other grounds for rejection are necessary testimony being incomplete, the member having continued to practice law after transfer to inactive status, the State Bar Court having filed a decision or opinion recommending the member's disbarment, the member having previously resigned or been disbarred and reinstated to practice, the member and Chief Trial Counsel having failed to agree upon a written stipulation as to facts and conclusions of law regarding the pending disciplinary matters, and acceptance of the resignation being "inconsistent with the need to protect the public, the courts, or the legal profession." (Cal. Rules of Court, rule 9.21(d)(1)–(9).)

[15] Section 6126 provides:

"(a) Any person advertising or holding himself or herself out as practicing or entitled to practice law or otherwise practicing law who is not an active member of the State Bar, or otherwise authorized pursuant to statute or court rule to practice law in this state at the time of doing so, is guilty of a misdemeanor punishable by up to one year in a county jail or by a fine of up to one thousand dollars ($1,000), or by both that fine and imprisonment. Upon a second or subsequent conviction, the person shall be confined in a county jail for not less than 90 days, except in an unusual case where the interests of justice would be served by imposition of a lesser sentence or a fine. If the court imposes only a fine or a sentence of less than 90 days for a second or subsequent conviction under this subdivision, the court shall state the reasons for its sentencing choice on the record.

"(b) Any person who has been involuntarily enrolled as an inactive member of the State Bar, or has been suspended from membership from the State Bar, or has been disbarred, or has resigned from the State Bar with charges pending, and thereafter practices or attempts to practice law, advertises or holds himself or herself out as practicing or otherwise entitled to practice law, is guilty of a crime punishable by imprisonment pursuant to subdivision (h) of Section 1170 of the Penal Code or in a county jail for a period not to exceed six months. However, any person who has been involuntarily enrolled as an inactive member of the State Bar pursuant to paragraph (1) of subdivision (e) of Section 6007 and who knowingly thereafter practices or attempts to practice law, or advertises or holds himself or herself out as practicing or otherwise entitled to practice law, is guilty of a crime punishable by imprisonment pursuant to subdivision (h) of Section 1170 of the Penal Code or in a county jail for a period not to exceed six months.

"(c) The willful failure of a member of the State Bar, or one who has resigned or been disbarred, to comply with an order of the Supreme Court to comply with Rule 9.20 of the California Rules of Court, constitutes a crime punishable by imprisonment pursuant to subdivision (h) of Section 1170 of the Penal Code or in a county jail for a period not to exceed six months.

"(d) The penalties provided in this section are cumulative to each other and to any other remedies or penalties provided by law."

the unauthorized practice of law. ██ Title 8 Code of Federal Regulations part 1003.102(m) (2012) provides for disciplinary sanctions against a practitioner who assists a person in the unauthorized practice of law. ██ Section 6133 prohibits any attorney or law firm employing a resigned attorney from permitting that attorney to practice law or hold himself out as practicing law, and requires the employer to supervise the resigned attorney in any other assigned duties.[16]

As a factual matter, appellants urge that they were permitted to appear before the immigration and federal courts, that Guajardo neither made appearances nor signed documents, and that since Stender and other IPG attorneys signed the pleadings filed in federal court, they were responsible for legal actions taken on behalf of clients and it was irrelevant whether Guajardo gave legal or factual advice to IPG clients. This argument misses the point. The complaint alleges, in essence, that by assuming the legal responsibility for actions undertaken on behalf of IPG clients, Stender and other IPG attorneys provided the means for Guajardo to continue his law practice. According to the clients' declarations, they were told, and led to believe by the conduct they observed, that Guajardo was their attorney, and it was Guajardo who developed the legal strategies for their cases, gave legal advice, and discussed and collected legal fees. Based on these declarations, the trial court's finding that appellants aided and abetted Guajardo's unauthorized practice of law was amply supported.

Appellants argue, however, that IPG and Stender cannot be liable for aiding and abetting because a corporation can act only through its employees and both Stender and Guajardo are employees or agents of IPG. They point to *Janken v. GM Hughes Electronics* (1996) 46 Cal.App.4th 55, 77–78 [53 Cal.Rptr.2d 741] (*Janken*), which held that only a corporation, not individual supervisory employees, could be liable for age discrimination in personnel practices in part because the employees could not be viewed as aiding and abetting the corporation. *Janken* explained that aiding and abetting, like conspiracy, requires concerted action by separate persons. (*Ibid.*) "A corporation can act only through its individual employees. . . . [¶] . . . A corporate employee cannot conspire with his or her corporate employer; that would be tantamount to a person conspiring with himself. Thus when a corporate employee acts in his or her authorized capacity on behalf of his or her corporate employer, there can be no claim of conspiracy between the

---

[16] Section 6133 provides: "Any attorney or any law firm, partnership, corporation, or association employing an attorney who has resigned, or who is under actual suspension from the practice of law, or is disbarred, shall not permit that attorney to practice law or so advertise or hold himself or herself out as practicing law and shall supervise him or her in any other assigned duties. A willful violation of this section constitutes a cause for discipline."

corporate employer and the corporate employee. (*Doctors' Co.* v. *Superior Court* [(1989)] 49 Cal.3d 39, 45 [260 Cal.Rptr. 183, 775 P.2d 508]; *Marin* v. *Jacuzzi* (1964) 224 Cal.App.2d 549, 554 [36 Cal.Rptr. 880].) In such a circumstance, the element of concert is missing. [¶] Similar reasoning applies to aiding and abetting. . . . [S]ince a corporation can act only through its employees, the element of concert is missing in the 'aiding and abetting' context just as in the conspiracy context." (*Janken, supra,* 46 Cal.App.4th at pp. 77–78.)

 As appellants acknowledge without discussing the point, this "agent's immunity rule" (*Applied Equipment Corp. v. Litton Saudi Arabia Ltd.* (1994) 7 Cal.4th 503, 512 [28 Cal.Rptr.2d 475, 869 P.2d 454]) applies only when the corporate employee acts "in his or her authorized capacity on behalf of his or her corporate employer." (*Janken, supra,* 46 Cal.App.4th at p. 78.) "[A]gents and employees cannot conspire with their principal or employer where they act on its behalf, ' "and not as individuals for their individual advantage." ' (*Doctors' Co., supra,* 49 Cal.3d at p. 45.)" (*1-800 Contacts, Inc. v. Steinberg* (2003) 107 Cal.App.4th 568, 591 [132 Cal.Rptr.2d 789]; see *Applied Equipment Corp., supra,* 7 Cal.4th at p. 512, fn. 4; *Everest Investors 8 v. Whitehall Real Estate Limited Partnership XI* (2002) 100 Cal.App.4th 1102, 1107 [123 Cal.Rptr.2d 297].) But agents can "be subject to 'conspiracy liability for conduct which the agents carry out "as individuals for their individual advantage" and not solely on behalf of the principal [citation].' " (*1-800 Contacts, Inc. v. Steinberg, supra,* 107 Cal.App.4th at p. 591, quoting *Doctors' Co., supra,* 49 Cal.3d at p. 47.)

Here, the complaint alleged that Guajardo practiced law without being licensed to do so, and that Stender and IPG aided and facilitated his doing so. Unlike the situation in *Janken,* where the challenged actions were taken by employees implementing corporate policies on behalf of the corporation, here the corporation (and agent through which it acted) were charged with aiding an employee's unlawful practice. In practicing law without a license, Guajardo was not acting on IPG's behalf; rather, the complaint alleged that IPG and Stender made it possible for Guajardo to continue practicing law despite his resignation from the bar. That pleadings were signed by Stender and other IPG lawyers does not, as appellants maintain, render irrelevant any legal advice Guajardo may have given to clients. On the contrary, the signing of pleadings is one of the means by which IPG and Stender were alleged to have aided Guajardo in his unauthorized practice of law.

Further, although appellants' violation of section 6125 could only be based on aiding and abetting Guajardo, their violation of rule 1-300(B), 8 Code of Federal Regulations part 1003.102(m) (2012) and section 6133 was direct.

While section 6125 prohibits the unauthorized practice of law, these other provisions directly prohibit attorneys from assisting another person's unauthorized practice of law.

More generally, appellants argue that the city is improperly using section 17200 as a means to regulate the practice of law, usurping the duties of the State Bar. Emphasizing that Stender is not a member of the California State Bar and practices in federal courts, appellants urge that the purpose of the State Bar rules is to regulate the practice of members of the California State Bar, not members of the federal bar. They rely upon *Benninghoff v. Superior Court* (2006) 136 Cal.App.4th 61, 64 [38 Cal.Rptr.3d 759], a case in which an attorney who resigned from the California State Bar with disciplinary charges pending went on to represent parties before state and federal agencies as a "self-styled 'lay representative.' " Finding that the former attorney was continuing to provide legal services to his clients, *Benninghoff* upheld the trial court's order taking jurisdiction over his state practice under section 6180. The trial court erred, however, in taking jurisdiction over the *federal* portion of the practice because the State Bar Act applies only to state courts and "state law cannot restrict the right of federal courts and agencies to control who practices before them." (*Benninghoff*, at p. 74.) Here—as the federal district court has already recognized in rejecting appellants' attempt to remove the action to federal court—the city is not attempting to regulate IPG's or Stender's practice in federal court but only to prevent the commission of unlawful business practices. As the federal district court put it, "[T]he gravamen of the complaint is not to regulate the practice of law but rather is to prevent a fraud upon the public. There is a distinction for our purposes between trying to regulate professional conduct, which plaintiff is not trying to do, and trying to prevent fraud on the public, which plaintiff is trying to do." (*California v. Guajardo* (N.D.Cal., Jan. 7, 2011, No. C 10-05658 WHA) 2011 U.S.Dist. Lexis 3401, p. *9.) This point is also dispositive of appellants' contention that the city is improperly using section 17200 as a means to usurp the duties of the California State Bar in regulating the practice of law.

█ Appellants additionally urge that this action is preempted because the regulation of practice before federal courts and agencies is a field completely occupied by federal law. Aside from the fact that, again, the present case is concerned with violation of state laws prohibiting unfair business practices rather than with regulation of the legal profession, the proposition that discipline of immigration attorneys is preempted by federal law has been rejected by the Ninth Circuit. (*Gadda v. Ashcroft* (9th Cir. 2004) 377 F.3d 934, 946.) As the federal district court in the present case explained in rejecting appellants' preemption argument: "This order disagrees that any scheme of federal regulation implicated in the complaint is so pervasive as to establish complete preemption. Defendants essentially argue that state laws

governing professional conduct cannot apply to attorneys and law corporations practicing immigration law, because federal law preempts such application. Our court of appeals has expressly held to the contrary. See *Gadda v. Ashcroft,*[ *supra,*] 377 F.3d 934, 946 . . . ('Gadda fails to show that federal regulation of attorneys before the immigration courts preempts state regulation of attorneys by express, field, or conflict preemption.'). . . . [¶] Yes, state court holdings concerning professional conduct under state law do not automatically pass for professional standards under federal law. See, e.g., *Benninghoff,*[ *supra,*] 136 Cal.App.4th at [p.] 74. But if the state courts can enjoin malpractice by federal practitioners—as has been conceded—then surely they can enjoin their frauds on the public without fear of complete preemption." (*California v. Guajardo, supra,* 2011 U.S.Dist. Lexis 3401 at pp. *13–*14, some italics omitted.)

Appellants do not explain their contention that this court should apply the doctrine of abstention except to quote from *Feitelberg v. Credit Suisse First Boston, LLC, supra,* 134 Cal.App.4th 997 that "courts may decline to decide UCL claims where a regulatory or administrative mechanism addresses the conduct at issue" and " '[w]here a UCL action would drag a court of equity into an area of complex economic policy, equitable abstention is appropriate.' " (*Id.* at p. 1009, quoting *Desert Healthcare Dist. v. PacifiCare FHP, Inc.* (2001) 94 Cal.App.4th 781, 795 [114 Cal.Rptr.2d 623].) *Feitelberg* was not about abstention; it discussed this point only as part of its explanation of the scope of the UCL. *Desert Healthcare* found abstention appropriate where the claimed unfair practices—which involved capitation agreements that the court stated were standard in the industry and approved of by governing legislation—would have required the court to delve "deep into the thicket of the health care finance industry, an economic arena that courts are ill-equipped to meddle in." (94 Cal.App.4th at p. 796.) The present case involves no such complex economic policy arena.

## II.

Appellants contend the trial court erred in issuing the injunction because Guajardo had already left IPG, IPG itself was no longer in operation, and there was no continuing risk of clients receiving legal services from Guajardo in the mistaken belief he was licensed to practice law. They note the trial court's question at the outset of the hearing "whether the defendant should be . . . subject to an injunction barring his participation with Guajardo going forward, in light of the evidence concerning Mr. Guajardo's current whereabouts and/or affiliation," and the court's removal of the language "continues to aid and abet" from the injunction.

The trial court's question was nothing more than its statement of direction for the hearing: After stating its general inclination to grant the request for the

injunction, the court identified the areas in which it had concerns as to the "details and breadth" of the proposed injunction. The People argued that the injunction was necessary because Stender had not disavowed Guajardo or Guajardo's actions, Stender's declaration demonstrated that he continued to hold Guajardo in high regard, the clients' declarations established that Stender failed to notify them that Guajardo was no longer associated with the firm, that failure indicated that Stender hoped to continue to benefit from the lure of Guajardo's name and reputation, and there was no evidence Stender would refuse to be associated with Guajardo if Guajardo returned. Stender, by contrast, argued that it was he who stepped in to take care of the clients who would have been left without representation after Guajardo's resignation, and that he and other IPG attorneys, not Guajardo, provided legal services to the clients. Stender argued that there was nothing wrong with an attorney taking over the practice of a suspended attorney and using the former attorney to assist in the transition and continued representation.

The trial court rejected this argument, finding that the People's evidence established a probability of success on the merits of the claims that Guajardo continued to provide legal services after Stender took over the practice. The picture painted by the clients' declarations was starkly contrary to that presented by Stender. According to the clients, they hired Guajardo because of his reputation as an immigration attorney; they were never informed that Guajardo lost his license to practice law; after Stender came into the practice and the name of the firm changed to IPG, Guajardo continued to act as their attorney and acted as the "boss" of Stender and other attorneys; and as a result, they continued to believe Guajardo was their attorney. As described above, after Guajardo's resignation from the bar, he expressly told several clients that he remained their attorney, and Stender told one client that Guajardo was "still your guy" and the other lawyers were "just here to help." Even in November 2010, after appellants say Guajardo left IPG, when the San Francisco City Attorney's investigator called IPG for an appointment with Guajardo, he was told he would be able to schedule one.

The clients' declarations amply support the court's determination that there was a probability the People would succeed on the merits of their claims. Notably, the record reflects no written notice to clients regarding Guajardo's resignation from the California State Bar and inability to practice law. The only written notice documented in the record is the March 5, 2008, order regarding Guajardo's resignation from the Ninth Circuit bar, which appellants demonstrate was signed by four of the clients who submitted declarations in this case. Putting aside the clients' insistence that they did not comprehend its meaning, this notice says nothing about Guajardo's status before the California bar.

Stender's high regard for Guajardo was evident in his declaration, which explained that Guajardo was a "highly experienced, longtime immigration attorney who had a reputation of being able to help clients" and that Stender intended to "learn how he was so successful in the vast majority of his cases." The evidence that Stender saw Guajardo as an asset to the practice, facilitated Guajardo's practice of law, and in fact assured clients that Guajardo continued to be their attorney, as well as that Guajardo left IPG of his own accord rather than at Stender's behest, supported the trial court's conclusion that the injunction was necessary to prevent Stender from resuming such practices again if Guajardo returned. The court's recognition that the injunction should not recite that IPG "aided and abetted and continues to aid and abet Guajardo's unauthorized practice of law," as originally proposed, but only that IPG "aided and abetted" the unauthorized practice, reflects the fact that at the time the injunction was issued, IPG was not *currently* aiding and abetting the practice. It ·does not undermine the court's conclusion that an injunction was necessary to prevent such conduct in the future.

Appellants further urge that the notice required by the court would cause irreparable injury to them by interfering with their relationships with their clients, while no irreparable injury would occur if the notice is not given. According to appellants, the notice wrongly states or implies facts that have yet to be proven, such as that Guajardo has a continuing relationship with appellants, that Guajardo gave legal advice, represented clients in immigration matters and otherwise acted as an attorney. Because the notice states that it is required by the court, appellants maintain that a recipient would view it as reflecting a final decision by the court on such facts. The notice would undermine clients' faith and trust in appellants by suggesting the court has a problem with appellants, and would interfere with appellants' relationship with their clients and invite speculation and confusion by implying that there is an ongoing relationship between appellants and Guajardo and suggesting actions for the client to take that are not justified by the evidence. Appellants contend it is improper for the notice to inform clients of their right to fire Guajardo and hire a licensed attorney because Guajardo no longer represents them and appellants already do, or to inform clients that IPG must immediately return unearned fees, when IPG no longer exists and Stender or other new attorneys may continue to represent the clients. They argue the notice wrongly states that it is illegal for Guajardo to discuss cases with the clients when rule 1-311(C) permits a resigned member to perform certain tasks on legal cases. They urge that the notice's reference to return of unearned fees invites clients to fire Stender or IPG and sue for return of fees, creating an immediate conflict between them and their clients.

Balanced against these harms, appellants maintain there would be no irreparable harm to clients if the notice is not given because there is no evidence Guajardo was attempting to represent clients at the time the

injunction was ordered or would do so in the future. Appellants argue that all IPG clients had a licensed attorney representing them, and no client has lost his or her right to hold those attorneys accountable.

As we have explained, these latter arguments miss the point. The trial court found a probability that the People would prevail on their claims that appellants facilitated Guajardo's unauthorized practice of law by providing the structure—not least of which was provision of licensed attorneys who could sign pleadings and perform formal functions Guajardo could not— within which Guajardo could continue to function as a lawyer for clients who believed him to be licensed. The evidence that the clients were originally Guajardo's, or came to IPG for Guajardo's services, that Stender held Guajardo in high regard and benefitted from his role in the practice, and that Guajardo chose to leave IPG rather than Stender and IPG taking action to stop his unlawful practice of law, supported the trial court's determination that the injunction was necessary.

As for the claimed harm to appellants and their relationship with their clients, nothing in the notice casts any aspersion on appellants or their representation. The notice is required to be provided to persons who are former clients of Guajardo or current or former clients of appellants on whose matters Guajardo worked. Since appellants assumed Guajardo's practice and employed him, there would be no reason for a client receiving this notice to infer anything more than that the court was requiring appellants to ensure that clients on whose cases Guajardo had worked were aware of Guajardo's resignation from the bar. The notice does not imply any fact found against appellants. Nor does it invite clients to fire appellants; it refers only to clients' rights to fire *Guajardo* if he has been acting as their attorney.

Under sections 6180 and 6180.1 and rule 1-311, appellants were required to give notice to the bar and to clients of Guajardo's bar status, stating in the notice that Guajardo was not permitted to, and would not "[r]ender legal consultation or advice to the client," "[a]ppear on behalf of a client in any hearing or proceeding or before any judicial officer, arbitrator, mediator, court, public agency, referee, magistrate, commissioner, or hearing officer," "[a]ppear as a representative of the client at a deposition or other discovery matter," "[n]egotiate or transact any matter for or on behalf of the client with third parties," "[r]eceive, disburse or otherwise handle the client's funds," or "[e]ngage in activities which constitute the practice of law." (Rule 1-311(B) & (D).) The representations in the notice are indisputable: Guajardo is not a licensed attorney, he resigned from the bar in the circumstances stated, and he is prohibited from performing the specified functions on behalf of clients.

 Appellants dispute the statement in the notice that Guajardo cannot "give legal advice or discuss your legal case," citing rule 1-311(C). This

specific argument was forfeited by appellant's failure to raise it in the trial court: Although appellants were given the opportunity to challenge and seek modification of the language of the notice, and did so in many particulars, they raised no issue with this aspect of the notice. (*Porterville Citizens for Responsible Hillside Development v. City of Porterville* (2007) 157 Cal.App.4th 885, 912 [69 Cal.Rptr.3d 105] [failure to bring deficiencies or omissions in tentative decision to trial court's attention forfeits issue for appeal]; *City of San Marcos v. Coast Waste Management, Inc.* (1996) 47 Cal.App.4th 320, 328 [54 Cal.Rptr.2d 588] [failure to object to language of proposed written order in trial court "effectively waived any objection to it"].) In any event, the functions that rule 1-311(C) specifies *may* be performed by a resigned attorney all refer to support roles; none include giving legal advice or discussing the client's *legal* case. (See fn. 10, *ante.*) Appellants' challenges to the portion of the notice dealing with return of unearned fees are also unavailing. The notice does not inform clients that there *are* unearned fees to be returned, only that *if* they fire Guajardo and *if* there are such fees, they must be returned immediately.

## III.

Finally, appellants argue that the trial court erred in issuing a mandatory injunction because they were precluded from presenting evidence in their defense by their obligation to protect the privacy and attorney-client privileges of their clients. Appellants claim they cannot defend against the application for injunction without divulging clients' privileged information, and the People have not obtained waivers from the clients.

 "The attorney-client privilege 'authorizes a client to refuse to disclose, and to prevent others from disclosing, confidential communications between attorney and client.' (*Solin*[ *v. O'Melveny & Myers* (2001)] 89 Cal.App.4th [451,] 456–457 [107 Cal.Rptr.2d 456]; see Evid. Code, § 950 et seq.)" (*Dietz v. Meisenheimer & Herron* (2009) 177 Cal.App.4th 771, 785–786 [99 Cal.Rptr.3d 464].) " 'Clearly, the fundamental purpose behind the privilege is to safeguard the confidential relationship between clients and their attorneys so as to promote full and open discussion of the facts and tactics surrounding individual legal matters. (*People* v. *Flores* (1977) 71 Cal.App.3d 559, 563 [139 Cal.Rptr. 546].) In other words, the public policy fostered by the privilege seeks to insure "the right of every person to freely and fully confer and confide in one having knowledge of the law, and skilled in its practice, in order that the former may have adequate advice and a

proper defense." (*Baird* v. *Koerner* [(9th Cir. 1960)] 279 F.2d [623,] 629.)' (*Mitchell* v. *Superior Court* (1984) 37 Cal.3d 591, 599 [208 Cal.Rptr. 886, 691 P.2d 642].)" (*Solin, supra,* 89 Cal.App.4th at p. 457 (*Solin*).)

Appellants maintain that "absent a waiver by each client whose confidential information will be disclosed, a lawsuit may not be prosecuted against a defendant who reasonably needs to disclose attorney-client privileged information in order to prepare a defense." For example, in dismissing a shareholder derivative suit alleging attorney malpractice in which the corporation had not waived attorney-client privilege, the court stated, "We simply cannot conceive how an attorney is to mount a defense in a shareholder derivative action alleging a breach of duty to the corporate client, where, by the very nature of such an action, the attorney is foreclosed, in the absence of any waiver by the corporation, from disclosing the very communications which are alleged to constitute a breach of that duty." (*McDermott, Will & Emery v. Superior Court* (2000) 83 Cal.App.4th 378, 385 [99 Cal.Rptr.2d 622].) In *Solin* an attorney filed a malpractice suit against a law firm from which he had obtained advice regarding his representation of clients whose confidential information he had disclosed in obtaining the advice. Affirming the trial court's dismissal of the action, the court found that the confidential information was critical to determining the central issues in the case, including what advice was given and why, and concluded that "because this lawsuit 'is incapable of complete resolution without breaching the attorney-client privilege, the suit may not proceed.' " (*Solin, supra,* 89 Cal.App.4th at p. 467, quoting *General Dynamics Corp. v. Superior Court* (1994) 7 Cal.4th 1164, 1170 [32 Cal.Rptr.2d 1, 876 P.2d 487].)

■ Appellants, however, state the proposition too broadly. "[A] court may take the extraordinary step of dismissing a plaintiff's claim on the ground that an attorney defendant's due process right to present a defense is compromised by the defendant's inability to present confidential information in support of that defense only in the rarest of cases . . . ." (*Dietz v. Meisenheimer & Herron, supra,* 177 Cal.App.4th at p. 794 (*Dietz*).) "If dismissal were required whenever a lawyer's ethical duties prevented the lawyer from presenting evidence having *any* relevance to the action, without respect to the materiality of the evidence, the 'drastic action' of dismissal would become commonplace. (*General Dynamics, supra,* 7 Cal.4th at p. 1190.)" (*Dietz, supra,* 177 Cal.App.4th at p. 792.)

■ Before dismissing a case "on the ground that a defendant attorney's due process right to present a defense would be violated by the defendant's inability to disclose a client's confidential information," a court must consider

"at least four factors": The evidence at issue must be the client's confidential information, which the client insists on keeping confidential; the evidence must be "highly material to the defendants' defenses"; the trial court must determine whether it could "effectively use 'ad hoc measures from [its] equitable arsenal,' including techniques such as 'sealing and protective orders, limited admissibility of evidence, orders restricting the use of testimony in successive proceedings, and, where appropriate, in camera proceedings,' so as to permit the action to proceed"; and the court "should consider whether it would be 'fundamentally unfair' to allow the action to proceed." (*Dietz, supra,* 177 Cal.App.4th at pp. 792–793.) The last of these considerations "is an extension of the principle that, '[t]he privilege which protects attorney-client communications may not be used both as a sword and a shield.' (*Chevron Corp. v. Pennzoil Co.* (9th Cir. 1992) 974 F.2d 1156, 1162.) . . . [B]oth the *McDermott* and *Solin* courts noted the inherent unfairness in allowing a plaintiff to bring a claim, which, by its very nature necessitates a defense based on confidential information, where the plaintiff has either directly supplied such confidential information to the defendant, as in *Solin,* or where the plaintiff seeks to derivatively represent a third party who has supplied such information to the defendant, as in *McDermott.* (See *Solin, supra,* 89 Cal.App.4th at p. 463 [citing Evid. Code, § 958, and stating that it is unfair for a party to sue upon advice provided by an attorney and then seek to prevent the attorney from presenting evidence pertaining to why the advice was given]; *McDermott, supra,* 83 Cal.App.4th at p. 384 [noting that pursuant to Evid. Code, § 958 a plaintiff's filing a malpractice claim against his or her attorney results in a waiver of the privilege to the extent necessary to defend the claim, but that 'because a derivative action does not result in the corporation's waiver of the privilege, such a lawsuit against the corporation's outside counsel has the dangerous potential for robbing the attorney defendant of the only means he or she may have to mount any meaningful defense'].)" (*Dietz, supra,* 177 Cal.App.4th at pp. 793–794.)

Here, it is not apparent how clients' confidential information would be necessary to defend against the People's claims. The allegations of unfair business practices upon which the injunction was issued pertain to appellants' conduct regarding Guajardo's loss of the right to practice law, such as what formal notice appellants did or did not give to clients and the bar and what clients were told and observed about whether Guajardo or a different attorney was performing legal services on their behalf. It is not obvious how any details of the clients' legal cases or legal advice they were provided would be required by appellants' defense.

Appellants do not elaborate on this question. They assert that in order to defend against the application for an injunction they would be required to "divulge their clients' private and privileged information," but they never identify what confidential information they would have to reveal in order to demonstrate that they did inform clients and give the required notice of Guajardo's resignation or that they did not permit Guajardo to provide legal services to clients. On the contrary, the statements in the declarations of Stender, Salazar-Cosmos and Robles-Avila that clients were told Guajardo no longer represented them, and appellants' submission of evidence of the Ninth Circuit order signed by certain clients, demonstrates appellants' recognition that these subjects can be addressed without violating client confidences. Appellants submitted neither any declaration from a client supporting their portrayal of what information clients were given about Guajardo's bar status, nor any documentation of notice that would comply with the requirements of sections 6180 and 6180.1 and rule 1-311.

The only specific example appellants discuss in arguing their defense would require them to divulge clients' confidential information is the identity of their clients. Appellants urge that because theirs is an immigration practice, revealing clients' identities carries the risk of prosecution or deportation as well as damage to the immigration case.

■■■ "Generally, the identity of an attorney's client is not considered within the protection of the attorney-client privilege. (*People v. Chapman* (1984) 36 Cal.3d 98, 110 [201 Cal.Rptr. 628, 679 P.2d 62]; *Hays v. Wood* (1979) 25 Cal.3d 772, 785 [160 Cal.Rptr. 102, 603 P.2d 19].) There is a recognized exception to this rule, however, where known facts concerning an attorney's representation of an anonymous client are such that the disclosure of the client's identity would implicate the client in unlawful activities, thus exposing the client to potential investigative action or criminal or civil liability. (See *Hays v. Wood, supra*, 25 Cal.3d 772, and cases cited therein.) [¶] Another recognized exception arises where known facts regarding an attorney's representation are such that the disclosure of the client's identity would betray personal, confidential information regarding the client. (*Rosso, Johnson, Rosso & Ebersold v. Superior Court* (1987) 191 Cal.App.3d 1514, 1518–1519 [237 Cal.Rptr. 242] [disclosure of the clients' identities under the circumstances would reveal private information regarding the clients' medical conditions].)" (*Hooser v. Superior Court* (2000) 84 Cal.App.4th 997, 1005 [101 Cal.Rptr.2d 341].)

In *Rosso, Johnson, Rosso & Ebersold v. Superior Court, supra,* 191 Cal.App.3d 1514 (*Rosso*), the plaintiff in a suit against attorneys who had advertised for potential clients among women who might have suffered problems from using the Dalkon Shield intrauterine device sought discovery

of a master list of the attorneys' Dalkon Shield cases. The court held that the names of clients who had responded to the advertisement were protected by attorney-client privilege. *Rosso* explained, " 'Courts in a few jurisdictions have supported the view that in unusual situations, particularly where so much is already known of the attorney-client relationship that to disclose a client's name will betray a confidential communication, the identity of a client may be treated as privileged information.' (Annot., 16 A.L.R.3d 1047, 1053; *State* v. *Bean* (Iowa 1976) 239 N.W.2d 556, 561; see also 81 Am.Jur.2d, Witnesses, § 213, pp. 244–246.) [¶] Because the people who are on the master list of clients have answered an advertisement directed to women who have suffered injury arising from the use of a Dalkon Shield, revealing their names would reveal the nature of a medical problem, ordinarily considered a confidential communication." (191 Cal.App.3d at pp. 1518–1519.) "Since disclosure here reveals the problem of the client, this is one of the exceptional cases where the identity of the client should be protected." (*Id.* at p. 1519.)

Although "disclosure of the identity of the client in the attorney-client setting usually says nothing regarding the reason for legal counsel or the content of the communication with the attorney . . ." (*Smith* v. *Superior Court*(1981) 118 Cal.App.3d 136, 142 [173 Cal.Rptr. 145]), we acknowledge that the situation may be different for a practice that specializes in a specific area of the law. In the medical context, "[i]f the disclosure of the patient's name reveals nothing of any communication concerning the patient's ailments, disclosure of the patient's name does not violate the [doctor-patient] privilege. (*Rudnick* v. *Superior Court* (1974) 11 Cal.3d 924, 933, fn. 13 [114 Cal.Rptr. 603, 523 P.2d 643]; *Ascherman* v. *Superior Court* (1967) 254 Cal.App.2d 506, 515–516 [62 Cal.Rptr. 547].) However, disclosure of the identity of the patient violates the physician-patient privilege where such disclosure reveals the patient's ailment. (*Blue Cross* v. *Superior Court* (1976) 61 Cal.App.3d 798, 800 [132 Cal.Rptr. 635] [patients treated for psoriasis]; *Marcus* v. *Superior Court* (1971) 18 Cal.App.3d 22, 24 [95 Cal.Rptr. 545] [patients given angiogram]; *Costa* v. *Regents of Univ. of California* (1953) 116 Cal.App.2d 445, 463 [254 P.2d 85] [patients receiving certain cancer treatments].) Any identification of a psychotherapist's patient is precluded because any treatment 'reveals the existence and, in a general sense, the nature of the malady.' " (*Rosso, supra*, 191 Cal.App.3d at p. 1519, quoting *Smith, supra*, 118 Cal.App.3d 136, 141–142.)

 By analogy, appellants maintain that because of the nature of their practice, revealing their clients' identities would reveal confidential information about the client, protected both by attorney-client privilege and the clients' constitutional rights to privacy. (See *Valley Bank of Nevada v. Superior Court* (1975) 15 Cal.3d 652, 656 [125 Cal.Rptr. 553, 542 P.2d 977] [even where statutory privilege does not apply, privacy rights may preclude discovery].) Appellants are undoubtedly correct that many clients of immigration

attorneys face deportation or other serious immigration problems. It is not necessarily the case, however, that *all* of appellants' clients are present in the United States illegally or without authorization, leaving appellants unable to rely upon any client's testimony without creating such risks. Moreover, appellants do not explain how their defense against the request for an injunction would require them to disclose the identities of any client other than those who have already revealed their identities by providing declarations to the People. Nor do they explain why, if it were necessary to introduce evidence from clients other than the People's declarants, the identities of such clients could not, if necessary, be protected by " 'ad hoc measures' " from the court's " 'equitable arsenal' " (*Dietz, supra,* 177 Cal.App.4th at p. 793, quoting *General Dynamics Corp. v. Superior Court, supra,* 7 Cal.4th at p. 1191) such as redaction or in camera review.

The fact that the factual allegations of the complaint describe misconduct going beyond the actual causes of action, alleging charges of exorbitant fees and performance of substandard work, does not change our analysis. Even if these allegations might require appellants to disclose details of particular cases that would violate attorney-client privilege, these are not the allegations upon which the injunction was issued. The trial court's findings address only the allegations concerning Guajardo's unlawful practice of law and appellants' facilitation of that practice. Accordingly, defense against the injunction did not require any revelation of privileged information.

Finally, as we have indicated, the findings underlying the trial court's decision to grant the injunction demonstrate the weakness of appellants' privilege claim. The injunction was issued to prevent further violations of appellants' duties to inform clients of Guajardo's bar status and refrain from assisting his unauthorized practice of law. The attorney-client privilege appellants claim prevents them from presenting their defense, as we have also stated, is meant to protect clients' right to freely confide in and receive advice from a trained attorney who can represent their interests and provide a defense. (*Solin, supra,* 89 Cal.App.4th at p. 457.) The People's claims against appellants are not based on the substance, content and details of their representation of their clients but, in essence, on their failure to protect the clients from, and active facilitation of, an unlicensed lawyer's provision of legal services. The advice given to the clients on their legal matters is not the point. The point is simply whether they were unlawfully provided legal services by an attorney who had resigned from the bar with disciplinary charges pending and was not authorized to practice law. To allow appellants to avoid liability for permitting and assisting an unlicensed lawyer to provide

legal services to their clients by invoking attorney-client privilege would turn the purpose of the attorney-client privilege—to protect clients' rights to legal counsel—on its head.

The judgment is affirmed. Costs to the People.

Lambden, J., and Richman, J., concurred.

On January 16, 2013, the opinion was modified to read as printed above. Appellants' petition for review by the Supreme Court was denied March 20, 2013, S208570.