Filed 4/4/14  P. v. Rodriguez CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

|  |  |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>STEPHEN ALLAN RODRIGUEZ et al.<br><br>    Defendants and Appellants. | B243578<br><br>(Los Angeles County<br>Super. Ct. No. BA361184)<br><br>**ORDER MODIFYING OPINION**<br><br>[No change in the judgment] |

THE COURT:

It is ordered that the opinion filed in the above-captioned matter on March 5, 2014, be modified as follows:

1.  On page 26, line 2 under subheading Disposition, the following sentence shall be deleted:

"The trial court is ordered to forward a corrected abstract of judgment to the Department of Corrections and Rehabilitation."

This modification effects no change in the judgment.

_____

BIGELOW, P. J.                FLIER, J.                GRIMES, J.

Filed 3/5/14  P. v. Rodriguez CA2/8 (unmodified version)
## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>STEPHEN ALLAN RODRIGUEZ et al.<br><br>    Defendants and Appellants. | B243578<br><br>(Los Angeles County<br>Super. Ct. No. BA361184) |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Leslie A. Swain, Judge.  Affirmed in part, reversed in part.

William J. Capriola, under appointment by the Court of Appeal, for Defendant and Appellant Stephen Allan Rodriguez.

Jonathan P. Milberg, under appointment by the Court of Appeal, for Defendant and Appellant Stephen Adrian Rodriguez.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Paul M. Roadarmel, Jr. and Daniel C. Chang, Deputy Attorneys General, for Plaintiff and Respondent.

_____

A jury found Stephen Allan Rodriguez (Senior) and Stephen Adrian Rodriguez (Junior) guilty of multiple counts of unauthorized practice of law, grand theft by false pretenses, and conspiracy to commit capping.[1]  The jury also found Senior guilty of perjury.  On appeal, Junior contends there was insufficient evidence to support the convictions against him.  Both defendants argue the trial court erred in failing to instruct the jury on accomplice testimony.  We reverse three of Junior's convictions and otherwise affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

In August 2010, the People filed a 15-count grand jury indictment charging Senior and Junior with five counts of unauthorized practice of law (Bus. & Prof. Code, § 6126, subd. (b)), four counts of grand theft (Pen. Code, § 487, subd. (a)), and one count of conspiracy to commit capping (Pen. Code, § 182, subd. (a)(1), Bus. & Prof. Code, § 6152, subd. (a)).  The indictment further charged Senior with five counts of perjury by declaration (Pen. Code, § 118, subd. (a)).  We summarize the evidence from the January 2012 trial in accordance with the usual rules on appeal.  (*People v. Virgil* (2011) 51 Cal.4th 1210, 1263 (*Virgil*).)

### *Prosecution Evidence*

Senior's bar membership was suspended from May 25, 2008 through November 25, 2008.  He was suspended again on May 3, 2009, and remained suspended at the time of trial.  Junior's bar membership was suspended from August 3, 2009 through December 15, 2009.

### Eileen Hinojosa & Jack Arizmendi (Counts 1 & 6)

In January 2008, police arrested Jack Arizmendi and his cousin for carjacking. In March 2008, Arizmendi's mother, Eileen Hinojosa, went to the county jail to visit him. While waiting in line to enter, she saw Victor Revelez handing out flyers.  Revelez was telling those in line about an attorney who obtained "great deals," and could help

---

[1]      In the trial court and on appeal, the parties have used the terms "Senior" and "Junior" to identify the defendants.  We do the same.

defendants avoid three-strike sentences.  Hinojosa asked Revelez if he had personal experience with the attorney.  Revelez told her he had been in county jail, facing a life sentence.  According to Revelez, the attorney got one of his strikes dismissed and Revelez avoided jail time.  Hinojosa asked for the attorney's card and said she would call.  Revelez urged her to call right then and make an appointment.  He said that although it was the weekend, the attorney would meet her at his house.  The business card Revelez gave her bore the name "Stephen Rodriguez, Sr." and the law firm name "Rodriguez and Rodriguez."

After visiting Arizmendi, Hinojosa called Senior.  He agreed to see her at his home that day.  Senior told Hinojosa he had been an attorney for many years, worked in many courts, and knew many important people.  He said his son was also an attorney and that Junior might appear in court on Arizmendi's behalf, but they would get a telephone call first to let them know.  Hinojosa hired Senior and agreed to pay him $5,000 to represent Arizmendi up to the preliminary hearing.  Hinojosa made a $1,000 payment at Senior's house.  Although Senior told Hinojosa that Junior might appear in court if Senior could not make it (after giving them advance notice), he did not tell Hinojosa that Junior would perform any other legal work on the case.

Hinojosa regularly went to Senior's office to make payments.  She complained to the receptionist, and directly to Senior, because Senior often did not show up in court, or was late.  Although several weeks passed, Hinojosa and Arizmendi did not know what was happening on the case, and Senior had not met with Arizmendi.  Senior told her: "Well, the court works in many different ways and we still have time to get to all that and I will go visit your son."

After the preliminary hearing, Senior told Hinojosa he was willing to continue representing Arizmendi and would charge another $5,000.  He suggested she would not want to find another attorney because he had experience and knew the history of the case.  Senior told her he would be doing the work on the case, and if he did not appear in court, Junior would.  Hinojosa agreed to retain Senior to continue representing Arizmendi.

3

Arizmendi was arraigned on May 22, 2008. Following the arraignment, the district attorney handling the case, Jennifer Turk, wanted to send a packet of discovery to Arizmendi's counsel. Senior had appeared at the preliminary hearing, so Turk was under the impression he was counsel of record, but she did not have his address. While attempting to find an address, Turk discovered Senior's bar membership was suspended. On August 13, 2008, Senior's office left a message for Turk asking her to call on the Arizmendi case. When Turk returned the call, Senior answered. Senior asked if there was an offer or a way to resolve the case. Turk said there was no offer. Senior indicated he wanted to resolve the case and might request a continuance at a hearing scheduled the next day.

The next day, August 14, Junior appeared in court on Arizmendi's behalf. Senior sat in the audience. Turk overheard Senior telling Hinojosa he would try to get an offer for Arizmendi. He also described part of his earlier telephone conversation with Turk. In September 2008, Senior again called Turk. He told Turk he was thinking of filing a motion to sever and asked whether she would object. Turk said she did not think the motion would be successful. Senior responded: "My client probably did it, but the other guy [is] more culpable." Although Junior entered appearances in the matter, Turk never spoke to Junior about the substance of the case. He never told her Senior was suspended.

Hinojosa's concerns remained the same. Although she continued making payments, she told Senior that Arizmendi needed to see him, and there were things Senior should request. Senior told her they had time and he would get to her son. He repeatedly promised to visit Arizmendi, but failed to do so. At some point after the arraignment, Hinojosa asked Senior about severing Arizmendi's case from the cousin's. Senior told her he would look into it and let her know; he also said he would look into "a deal" for Arizmendi. Neither Senior nor Junior told Hinojosa about Senior's suspension.

On October 28, 2008, there was a hearing scheduled in Arizmendi's case. Senior checked in with the calendar deputy, but said he was waiting for Junior to arrive. Later, Arizmendi and Junior were inside the courtroom. Hinojosa was outside in the hallway, talking with Senior. Hinojosa asked Senior about severance and the status of the

4

case. Senior told her Junior would handle the appearance that day. Hinojosa was confused and taken aback that the case was going to trial. She expressed her frustration that at every court date neither Senior nor Junior was there, or they were late, many court dates had gone by, and now her son's case was going to trial. Senior asked what she wanted him to do. Hinojosa asked Senior to talk to Arizmendi, because the two had not yet met.

In the courtroom, Turk again heard Senior talking to Arizmendi's family about trying to resolve the case. Turk also saw Senior talking to the co-defendant's counsel about an offer. Senior repeatedly crossed the bar. He filled out a medical order for Arizmendi. He also attempted to go into the lockup. The bailiff asked to see his credentials. Senior said he did not have them, but tried to enter again. The bailiff repeated that he first needed to see Senior's credentials. Senior said he needed to see his client. The bailiff did not allow him to enter the lockup.

The court called the Arizmendi case. As Turk was reporting on the case status, Senior crossed the bar and began talking to Junior. The court asked who Senior was. The following colloquy was reported on the record:

> "Court: Wait. Time out. Who is this gentleman?
> Deputy: I'm trying to find out right now who he is.
> [Junior]: Co-counsel.
> Court: He's saying he's counsel of – Is he licensed to practice law? Excuse me. Excuse me.
> Deputy: That's what I asked him right now . . . .
> Court: Counsel, I asked a question.
> [Junior]: Yes, your honor. [¶] . . . [¶]
> Court: You are an attorney licensed to practice law at this time; is that right or not?
> [Senior]: Not at this time, your honor.
> Court: Then what is he doing behind the bar?
> [Junior]: Just because he has worked up this case.
> Court: I don't want him behind the bar.
> Deputy: He also made an attempt to get into lock-up earlier.
> Court: Is that true, you were?
> [Senior]: No, your honor.
> Court: Is that – the bailiff just said that. Is that your understanding or not?
> [Senior]: I was just – May I approach, your honor?

5

Turk: May we identify him, your honor, for the record?
Court: I know who you are. For the record, who are you?
[Senior]: Attorney Stephen Rodriguez, your honor.
Court: Right. Why did you try to get into the lock-up?
[Senior]: Just to give a message from the mother.
Court: Why didn't you give it to your son?
[Senior]: I was trying to.
Court: Well, why didn't you just wait?
[Senior]: I was just trying to give the message to my – to my son to give the message to the defendant.
Court: You're not licensed. You know you can't do that.
[Senior]: I understand that."

Junior told Hinojosa: "I know this looks bad." This was the first time Hinojosa learned of Senior's suspension, and the first time she had ever spoken to Junior about the case. Junior said Senior would explain things to her, but asked that she not terminate their representation. He offered to reduce their fee by $1,000. Arizmendi fired Junior on the spot. Senior later called Hinojosa and apologized for not telling her his license was suspended. He said he had not felt it was necessary because he was going to be reinstated soon. Neither Rodriguez refunded any of the $10,000 Hinojosa paid.

**Foster Corder and Maria Gutierrez (Counts 2 & 7)**

In June 2008, Maria Gutierrez was arrested. Her then boyfriend, Foster Corder, and her daughter, Jennifer Landaverde, met with Senior about the case in July 2008. Corder thought Senior seemed reputable; he had been recommended to Landaverde as a "Latino Johnnie Cochran." They decided to hire Senior for a $5,000 fee. Corder paid $2,500 at the first meeting with Senior. Senior said he would visit Gutierrez that day. Junior was not present during the meeting.

Senior did not visit Gutierrez in jail. When Corder asked Senior why he had not visited Gutierrez, Senior said he intended to. He later said Junior would visit her. Junior made the court appearances instead of Senior. Corder asked Junior about visiting Gutierrez in jail, and Junior said he was going to see her. Junior did not tell Corder he was appearing in court on Gutierrez's case because Senior was suspended. Corder had frequent conversations with Senior about the case, but he only had contact with Junior in

6

court.  However, Junior missed several court appearances, or was late.  Senior told Corder the absences and tardiness occurred because the firm's case load was heavy.  Senior explained that he was involved in the case, but Junior went to court.  Corder paid the entire $5,000 fee.

Eventually, Corder found a new lawyer.  In October 2008, Corder requested a refund because he was dissatisfied with the Rodriguezes' legal services.  He informed the office that if they refused, he would report the matter to the bar.  Senior called Corder the next day and suggested he come to the office to talk.  In the office, Senior told Corder that writing a letter to the bar would cause him problems.  He admitted his bar membership had been suspended.  Senior agreed to refund Corder $800, in exchange for a release of all claims.

### Mary Ann Alvarado (Counts 3 & 8)

In 2007, Mary Ann Alvarado hired Senior to defend her in a civil real estate matter.  The retainer agreement required a $5,000 "down payment."  Alvarado made an initial $1,000 payment, then subsequently paid additional amounts.  Senior told Alvarado he would represent her in court.  In 2008, Alvarado and Senior had a disagreement because, in her view: "I was paying out a lot of money and I didn't see him in the courts and I was taking a lot of time out of work coming to the appearances all the time and he was never there and always calling me or finding out later then that there was continuances on the cases."  In June 2008, Alvarado signed a substitution of attorney form, substituting herself in place of Senior.  Alvarado's father later spoke with Senior and decided Senior should continue representing Alvarado.  Alvarado paid Senior more money.  In September 2008, Alvarado signed a new retainer agreement.  She had no conversations or meetings with Junior.

In September 2008, Senior called James Treadwell, an attorney representing another party in the case.  Senior told Treadwell he was representing Alvarado again and discussed the case.  He offered to provide a declaration from Alvarado in support of a motion for judgment Treadwell had filed, and asked whether Treadwell was willing to

7

stipulate to a continuance of the trial date. Senior did not tell Treadwell he was suspended from practice.

On October 22, 2008, there was a hearing in Alvarado's case. Junior entered an appearance, but mistakenly indicated he represented the plaintiffs, instead of Alvarado, the defendant. Senior was in the audience. Junior looked back at Senior, who then signaled that Alvarado was the client. It appeared that Junior knew nothing about the case. After the appearance, Senior approached Treadwell in the hallway and asked about a settlement between Treadwell's client and the plaintiffs. Senior also asked if Treadwell might speak to his client about a loan modification program for Alvarado.

At an October 28 hearing, Senior was at the courthouse with Junior. Senior told Alvarado that Junior would go into the courtroom with her because he had to make an appearance elsewhere. Junior entered the courtroom but indicated he could not stay because of a trial or hearing in another court. Alvarado then overheard a discussion between another attorney and the judge suggesting Senior could not be in the courtroom. Alvarado called the Rodriguez office. The receptionist told her Senior was suspended from practice. However, Alvarado continued to pay the firm. Eventually Senior told her he was no longer suspended.

**Erika Perez and Jose Perez (Count 3)**

In October 2008, Jose Perez was arrested. His girlfriend, Erika Perez, and his grandmother went to the courthouse some time after.[2] On the stairs outside the courthouse, they saw Victor Revelez handing out flyers. Revelez told those waiting that the attorney advertised in the flyers had helped him get a reduced sentence. Perez took a flyer, which advertised the Rodriguez and Rodriguez firm. She called the number listed and was put in touch with Senior. The next day, Perez met Senior in his office. Senior agreed to represent Jose for $5,000. Perez paid $1,000; Senior told her she could pay the

---

[2]    To avoid confusion, we refer to Jose Perez by his first name, and to Erika Perez as "Perez." We refer to Emmanuel and Vincent Ochoa, *post*, by their first names.

remaining $4,000 in installments.  Senior said he would visit Jose in jail, and appear at the next court date.

However, Senior did not attend the next court date on October 30, 2008. The firm's receptionist told Perez that Senior was busy and would not be able to make it. Senior did not return Perez's calls.  On November 3, 2008, Perez made a $500 payment. At a November 13 court date, Junior came to court, late.  The case had already been called, and the court refused to reopen the matter.  Perez spoke with Junior as he was leaving the courthouse.  He seemed to know nothing about the case.  He told Perez she should speak with Senior about the case.  Perez asked about Junior visiting Jose in jail. Junior said neither he nor his father had been able to visit Jose because the jail was too far away.  In telephone conversations, Senior had previously told Perez he was unable to visit Jose because of the distance.  Neither Senior nor Junior told Perez that Senior was suspended from practicing law.

### Vincent and Emmanuel Ochoa (Counts 5 & 9)

In 2009, Vincent Ochoa and his son, Emmanuel, were arrested.  Emmanuel was arrested for selling drugs.  Vincent was arrested for being a convicted felon in possession of a firearm.  Vincent was released on bail, but Emmanuel remained in custody.  In March 2009, Vincent went to county jail to visit Emmanuel.  While Vincent was waiting in line, Victor Revelez started talking to him.  Revelez talked about the attorneys who had helped him, and suggested they could help the Ochoas.[3]  Revelez gave Vincent a card and a flyer.  He told Vincent to call the number and mention "Victor."  Vincent called the number on the card and spoke with Junior.  Junior suggested the police had acted illegally, and the case could easily be taken care of.  He asked Vincent to come into

---

[3]     Vincent recounted that Revelez said: "You know what, that sounds like something that happened to me, you know, and I know these [] guys can help you out."

9

the office. That Saturday, Vincent met with Senior.[4] Senior expressed confidence that he could get the charges dropped due to an illegal search. Junior joined the meeting later. Vincent decided to hire the Rodriguezes for a $2,500 fee. He paid $1,000 soon after the initial meeting. Senior was to represent Emmanuel, and Junior was to represent Vincent.

Both cases were continued several times. Vincent testified that at hearings on his case, Junior always made appearances, as he said he would. Emmanuel recalled being represented by Senior at an April 8, 2009 hearing, and seeing Senior again at the next court date, which was April 24.[5] Emmanuel spoke with Senior on the telephone between the two April court dates. Senior spoke to him in the lockup once. He testified this may have been on or after the second court date. He could not recall if the meeting took place in April or May 2009. After that brief visit in the lockup, Emmanuel never saw Senior again.

At a May 13 hearing, the court told Junior a signed conflict waiver was required for him to represent both Ochoas. At some point, Junior told Vincent to sign a conflict waiver. Junior said Senior was busy on something else. Vincent assumed Senior was busy on other work. When Emmanuel asked why Junior was appearing on his behalf, Junior told him Senior was somewhere else. Junior also had Emmanuel sign a conflict waiver, but did not explain in any detail why he would now be representing both Vincent and Emmanuel.

After several continuances, and when it appeared that Vincent's case might go to trial, he conducted some internet research and learned that Senior had been suspended. Vincent called the office to confront Senior with this information; Senior confirmed it was true.

---

[4] Vincent testified that when he arrived at the office he met with Senior. He knew he had spoken with a different person on the telephone. When Junior entered the meeting later, Vincent recognized him as the person with whom he had spoken on the telephone.

[5] Emmanuel recalled that Senior represented him *and* his father.

**Victor Revelez**

Revelez testified that, for around one year, Senior employed him to pass out flyers. Revelez knew Junior, but never talked with him about handing out flyers. Senior gave Revelez the flyers and business cards, and paid Revelez $40 per day. Senior told Revelez to pass out the flyers at the downtown county jail; Revelez also passed out the flyers at county courthouses. He received a commission when potential clients told the Rodriguezes that Revelez sent them.

The People charged Revelez in the instant case with conspiracy to commit capping. He pled no contest. He testified he received nothing in exchange for his testimony in the case. He had suffered multiple misdemeanor convictions, and was in prison at the time of his testimony due to a felony conviction for petty theft with a prior petty theft. However, he only had one "strike" on his record. During the time he was handing out flyers he was a drug addict and was "sometimes delusional" because of his drug use.

**Additional Evidence[6]**

The People offered the testimony of an assistant chief trial counsel for the State Bar of California, Alan Gordon. Gordon explained the meaning of a suspension from the State Bar, and the limitations placed on suspended attorneys. Among other things, Gordon explained that under Rule 9.20 of the California Rules of Court, a suspended attorney must give notice of the suspension to clients with active cases. The attorney must return client files to the clients or make the files available to be picked up. The attorney must also refund to clients any unearned legal fees. In addition, if the attorney represents clients in any pending litigation, he or she must notify opposing counsel of the suspension, and serve the notice on the court in which the action is pending. A suspended attorney may not do anything that would constitute practicing law, including

---

[6] The jury found the Rodriguezes not guilty on Count 4. We do not summarize the evidence relevant to that count.

giving legal advice, appearing in court, negotiating with opposing counsel, or holding himself or herself out as entitled to practice law.[7]

The firm's office manager, Maria Linda Quimpo, testified. According to Quimpo, Revelez handed out flyers for the firm. He spoke with either Senior or the receptionist. She did not recall him speaking to Junior. Junior handled all of Senior's court appearances while Senior was suspended. Quimpo prepared letters regarding Senior's suspension, but she did not personally mail them.

### Defense Evidence

Junior testified on his own behalf. According to Junior, Senior did most of the work on the Arizmendi case through the preliminary hearing. After the preliminary hearing, Hinojosa called Junior and asked if he would be able to represent Arizmendi at a May 22 arraignment. She had an outstanding balance, which had been reduced to $800. Junior told Hinojosa if she paid the balance he would appear at the arraignment, provided Hinojosa signed a new retainer agreement and paid a new retainer amount. Junior spoke with District Attorney Turk on "many occasions," including at the arraignment. He repeatedly asked about an offer or an indicated sentence. Turk did not make an offer that was going to be acceptable to Arizmendi.[8] Junior had multiple discussions with Arizmendi in court, and on the telephone. He recalled having a discussion with Hinojosa

---

[7] Gordon also testified that an active lawyer may employ a suspended lawyer to perform clerical or non-legal functions. However, if the active lawyer employs a suspended lawyer to perform tasks such as conducting legal research, accompanying the lawyer to a deposition, or working on a client matter, the active lawyer must provide notice to the State Bar in writing before hiring the suspended lawyer. The active lawyer must notify the State Bar again when the employment ends. If the suspended attorney is to work on client matters, the active lawyer must also notify those clients that he or she has an employee working in the office who is suspended from practice.

[8] On cross-examination on this point, Junior appeared to be unable to explain the difference between an indeterminate and a determinate sentence. He could not provide the correct sentencing range for a straight robbery. Junior testified that Turk made offers of only 47 years to life, or 35 years to life. However, on cross-examination, Junior admitted such a sentence would have been illegal because Arizmendi was not facing a life sentence.

in September 2008, in which he discussed the status of Arizmendi's case with her; the same afternoon he spoke with Turk. Junior never said or implied that Senior was working on the case. However, he admitted that on October 28, 2008, he told the court Senior was his co-counsel. Junior testified: "I told Judge Fisher that my father had worked up the case prior to – prior to me being involved. And so, what I meant to say he was fact of the matter counsel, not co-counsel, but I was –that's what is on the record."

Senior represented Alvarado until May 21, 2008. At that time, Senior and Junior met with Alvarado to inform her they would no longer represent her. Junior had reviewed Alvarado's account and saw "hours and hours that were being spent" on the case, and "it was backing up other things." Junior was unwilling to substitute in as counsel for Alvarado on May 21 unless she was able to make a "substantial payment" for her previously incurred legal fees. Junior subsequently had several telephone conversations with Alvarado. In September 2008, Alvarado asked Junior to represent her again. He had her sign a new retainer agreement and substitution of attorney form identifying him as her counsel. Junior admitted he never told Alvarado that Senior was suspended. He testified that on September 24, 2008, he spoke with Treadwell on the telephone to let Treadwell know he would be representing Alvarado.

On the Ochoa matter, the initial plan was for Senior to represent Emmanuel Ochoa, and Junior would represent Vincent. Junior took over the representation of Emmanuel because of his father's suspension. He filed a motion to suppress in their case. Junior testified he told the Ochoas about Senior's suspension, and that Senior told Emmanuel about the suspension as well.

Junior testified he met with Jennifer Landaverde, Maria Gutierrez's daughter. Junior did not recall that Foster Corder was present at the first meeting. Landaverde signed a retainer agreement with Junior. Junior did not tell Landaverde or Corder that Senior would appear on Gutierrez's behalf.

According to Junior, while Senior was suspended he made no court appearances on behalf of clients, and did not perform any legal work on cases. Junior took on all of Senior's cases and did all the work. He was "stretched thin" as a result, and suggested he

13

was not "able to hold clients' hands as much as they wanted them to be held," although he felt he represented them competently.

On cross-examination, Junior admitted he met with Erika Perez, and the office intake form indicated she was referred to the firm by Revelez. He denied ever telling Perez to talk to Senior about the case.

### *Verdict and Sentence*

The jury found Senior and Junior each guilty of four counts of unauthorized practice of law (Bus. & Prof. Code, § 6126, subd. (b); counts 1-3, 5); four counts of grand theft of personal property (Pen. Code, § 487, subd. (a); counts 6-9); and one count of conspiracy to commit the crime of capping (Pen. Code, § 182, subd. (a)(1), Bus. & Prof. Code, § 6152, subd. (a); count 10). The jury additionally found Senior guilty of two counts of perjury by declaration (Pen. Code, § 118, subd. (a); counts 11, 14.) At sentencing for Senior, the trial court suspended imposition of sentence for count 1, placed Senior on three years of formal probation, and ordered him to serve 180 days in county jail. Imposition of sentence was also suspended on the remaining counts, with identical terms and conditions, and concurrent jail time. Junior's sentence was the same, except that he was ordered to serve 30 days in county jail.

## DISCUSSION

### I.  Substantial Evidence Supported Junior's Convictions for Aiding and Abetting Senior's Unauthorized Practice of Law on Counts 1, 2, and 3

Junior argues there was no substantial evidence supporting his convictions for the unauthorized practice of law. He does not contend the evidence was insufficient to support the jury's conclusion that Senior was engaged in the unauthorized practice of law. Instead, Junior argues only that there was insufficient evidence that he aided and abetted Senior's crime. We disagree, except as to count 5.

" 'In assessing the sufficiency of the evidence, we review the entire record in the light most favorable to the judgment to determine whether it discloses evidence that is reasonable, credible, and of solid value such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.] Reversal on this ground is

14

unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction]." [Citation.]' [Citation.]" (*People v. Wilson* (2010) 186 Cal.App.4th 789, 805.) We presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. (*Virgil, supra,* 51 Cal.4th at p. 1263.)

Under Business and Professions Code section 6126, subdivision (b), any person who "has been suspended from membership from the State Bar . . . and thereafter practices or attempts to practice law, advertise or holds himself or herself out as practicing or otherwise entitled to practice law, is guilty of a crime. . . . ." The People's theory as to Junior was that he aided and abetted Senior's violation of this provision. To be liable as an aider and abettor, the defendant must have acted "with knowledge of the criminal purpose of the perpetrator and with an intent or purpose either of committing, or of encouraging or facilitating commission of, the offense." (*People v. Beeman* (1984) 35 Cal.3d 547, 560, italics omitted.)

As to each of the victims in counts 1 to 3, there was evidence that Junior aided and abetted Senior by facilitating his unauthorized practice of law. On the Arizmendi case (count 1), Junior appeared in court on Arizmendi's behalf after Senior's first suspension began. However, Hinojosa continued discussing the case with Senior, including trial strategy. The evidence at trial indicated Junior did not assume responsibility for any aspect of the case except the court appearances. He did not speak with the district attorney; instead Senior continued to attempt to negotiate with Turk. Junior also did not tell Hinojosa that Senior was suspended. During the October 28, 2008 court appearance, Junior told the court Senior was his co-counsel. After the in-court incident, Junior told Hinojosa that Senior would explain the situation to her, and acknowledged that it "looked bad." Junior had never before spoken to Hinojosa about the case. This evidence established that Senior was holding himself out as able to practice by continuing to discuss the case with Hinojosa, including legal strategy, contacting the district attorney, and trying to get an offer from the district attorney's office. In the meantime, Junior merely appeared in court. The jury could reasonably interpret this evidence as

15

demonstrating Junior knowingly facilitated and encouraged Senior's unauthorized practice by "covering" for him in court appearances, while Senior continued managing the case outside of court.

Similarly, on the Gutierrez case (count 2), Junior's involvement was limited to making court appearances, while Senior continued managing the case behind the scenes. And, as in the Arizmendi case, Junior did not reveal that Senior was suspended from practice, even as Senior continued having discussions with Corder about the case.

On the Alvarado case (count 3), Junior's role in assisting Senior's unauthorized practice was even more apparent. Junior never spoke to the opposing counsel or Alvarado until he appeared in court in October 2008. Instead, Senior met with Alvarado and discussed the case with Treadwell. At the October 2008 hearing, Junior displayed his unfamiliarity with the case when he indicated in court that he represented the opposing party, and had to look back at Senior for guidance. It was thus clear Junior was facilitating Senior holding himself out as the attorney responsible for the case. Similarly, on the Perez case (count 3), Junior not only knew nothing about the case, he also told Erika Perez she should talk with Senior about the case instead of him. Senior was suspended at the time.

Junior testified he took on Senior's cases, and Senior stopped working on all matters while his bar membership was suspended. However, Junior's testimony directly contradicted that of many other witnesses, and the jury was entitled to disbelieve his testimony. In all of these cases (counts 1 to 3), the jury could reasonably infer that Junior and Senior, partners in a law firm, worked together on Senior's cases during his suspension. The evidence showed Senior continued acting as a lawyer on the cases by advising clients and conducting negotiations or discussions with opposing counsel, while Junior simply appeared in court. From Junior's lack of knowledge about the substance of the cases, the jury could reasonably infer he had not assumed responsibility for Senior's clients in any meaningful way, and therefore was relying on Senior to continue handling the out-of-court responsibilities attendant to those cases. Junior's participation in

16

Senior's cases was of such a nature that he made it possible for Senior to continue holding himself out as a practicing lawyer to clients, and to opposing counsel.

Two cases are particularly instructive. In *Crawford v. State Bar* (1960) 54 Cal.2d 659, the California Supreme Court upheld a State Bar action to publicly reprove an attorney for violating ethics rules. The attorney had formed a partnership with his father, who was subsequently disbarred. (*Id.* at p. 662.) The court affirmed a finding that the son aided and abetted the father's unauthorized practice of law. Although the father identified himself as a tax consultant rather than a lawyer after he was disbarred, he gave legal advice, conferred with clients alone, and took full responsibility on more than one matter. The firm charged fees for his services, including services unrelated to the father's tax practice. The son maintained that although the firm had been organized as a partnership, after the father was disbarred, the son merely employed the father to work as a law clerk, bookkeeper, office manager, and to conduct a tax practice. (*Ibid.*) Yet, the court found the board's aiding and abetting finding was supported by the evidence. The record established the father "acted independently of [the son] both in regard to matters involving legal advice, and to matters that can be characterized as such because performed in a law office, and that [the son] merely had knowledge of the existence of them but not of their progress or disposition." (*Id.* at p. 668.)

There was similar evidence in this case. Although Junior purported to take over Senior's clients during the suspension period, Junior did not tell the clients of Senior's suspension, and barely met with them or spoke with them, if at all. Meanwhile, Senior continued giving the same clients legal advice, conferred with them, and engaged with opposing counsel. Junior identified Senior as his "co-counsel" in the Arizmendi case. He looked to Senior for direction during an appearance on the Alvarado case. And he told Erika Perez to discuss the case with Senior, not him. The evidence was sufficient to allow the jury to conclude that Junior aided and abetted Senior's unlawful practice of law.

17

*People Ex Rel. Herrera v. Stender* (2012) 212 Cal.App.4th 614 (*Stender*), is also instructive. In *Stender*, the defendants challenged a preliminary injunction requiring them to notify clients that one of the firm's lawyers was unauthorized to practice law. In issuing the injunction, the trial court found the defendant law firm (IPG) and lawyers (Stender, and others) aided and abetted the unlicensed attorney's unauthorized practice. (*Id.* at p. 638.) Although the attorney (Guajardo) had resigned from the bar, he continued meeting with clients and discussed case and legal strategy with them. (*Id.* at p. 622.) Clients had the impression Guajardo was the head of the office and other attorneys worked for him. When one client asked which of the firm's attorneys was his lawyer, another attorney pointed to Guajardo and said, " ' "He's still your guy. We're just here to help." ' " (*Id.* at pp. 622-623.)

The Court of Appeal agreed with the trial court on the aiding and abetting finding. The court rejected the defendants' argument that they were permitted to appear in court, Guajardo did not make appearances or sign documents, and since the firm and other attorneys "signed the pleadings filed in federal court, they were responsible for legal actions taken on behalf of clients and it was irrelevant whether Guajardo gave legal or factual advice to IPG clients." (*Stender*, *supra*, at p. 638.) The court explained: "The complaint alleges, in essence, that by assuming the legal responsibility for actions undertaken on behalf of IPG clients, Stender and other IPG attorneys provided the means for Guajardo to continue his law practice. According to the clients' declarations, they were told, and led to believe by the conduct they observed, that Guajardo was their attorney, and it was Guajardo who developed the legal strategies for their cases, gave legal advice, and discussed and collected legal fees. Based on these declarations, the trial court's finding that appellants aided and abetted Guajardo's unauthorized practice of law was amply supported." (*Ibid.*)

Although the procedural posture of this case is different, the principles underlying the aiding and abetting findings are the same. As in *Stender*, there was evidence that Senior continued developing legal strategy for his cases, gave legal advice, collected fees, and gave the impression that he was in charge on the cases. Junior's statements at times

18

explicitly assisted in creating that impression. He otherwise made it possible by appearing in court on Senior's cases, and filing necessary documents, all without informing clients or the court that Senior was suspended. There was no indication that Junior's involvement in the cases was anything other than cursory. Substantial evidence supported the convictions on counts 1, 2 and 3.

We agree, however, that there was insufficient evidence to support Junior's conviction on count 5. There was no substantial evidence that Senior had any further involvement in the representation of the Ochoas after his suspension began. When Vincent retained the Rodriguez firm, Senior was not suspended. He remained authorized to practice for the first two months of the case. Emmanuel, supposedly Senior's client, did not recall seeing Senior after an early hearing in his case. He could not recall whether his one in-person meeting with Senior was in April or May 2009. Vincent likewise could not recall when Senior last appeared in court. Although a motion to suppress was filed, there was no evidence Senior had any role in preparing it. In contrast to Senior's other matters, there was no evidence Senior had telephone conversations or meetings with Emmanuel, Vincent, or anyone related to the case after he was suspended. Although neither Emmanuel nor Vincent could be specific on dates, their recollections indicated they were unaware of Senior participating in the case after Junior told them a conflict waiver was necessary. The court directed defense counsel to file a conflict waiver at the May 13, 2009 hearing.

Junior did not tell the Ochoas that Senior was suspended. Yet, that willful omission, standing alone, is not substantial evidence he aided and abetted Senior's unauthorized practice. Junior explicitly and formally took over the representation of Emmanuel. Emmanuel recalled that the court told Junior a conflict waiver would be required. While on other matters, Junior appeared to represent the clients in name only while Senior continued performing legal work in the background, on the Ochoa matter there was no evidence that Senior maintained any involvement in the case. The People point to evidence that the retainer agreement bore the name "Rodriguez and Rodriguez." However, Vincent Ochoa was presented with the retainer agreement at a time when

19

Senior was not suspended. There is no evidence that having the partnership name on the retainer agreement at that time was improper. Thus, we must reverse the conviction on count 5.**⁹**

## II. Substantial Evidence Supported the Grand Theft Convictions on Counts 6 to 8

Junior further contends insufficient evidence supported the jury's guilty findings on counts 6 to 9 for grand theft of personal property. We agree only as to count 9.

" 'A theft conviction on the theory of false pretenses requires proof that (1) the defendant made a false pretense or representation to the owner of property; (2) with the intent to defraud the owner of that property; and (3) the owner transferred the property to the defendant in reliance on the representation. [Citations.] In this context, reliance means that the false representation "materially influenced" the owner's decision to part with his property; it need not be the sole factor motivating the transfer. [Citation.] A victim does not rely on a false representation if "there is no causal connection shown between the [representations] alleged to be false" and the transfer of property. [Citations.] Thus, if the defendant makes both true and false statements to the owner, but the false statements are irrelevant to the owner's decision to transfer the property, theft on the theory of false pretense has not been committed. [Citation.] Reliance may be inferred from all the circumstances. [Citation.]' [Citation.]" (*People v. Miller* (2000) 81 Cal.App.4th 1427, 1440-1441 (*Miller*).)

---

**⁹** One of the People's exhibits at trial was a minute order from Vincent's case, including a minute order from the May 13, 2009 hearing. The order indicated Vincent was represented by "S. Rodriguez Sr. Private Counsel." However, Vincent could not confirm that Senior represented him in court that day. The order from the same date in Emmanuel's case indicated he was represented by "Stephen Rodriguez Private Counsel." Both minute orders indicated defense counsel was to file a signed conflict waiver by the next court date. Emmanuel recalled the judge ordering *Junior* to file a conflict waiver. At trial, the prosecutor argued that on May 13, 2009, Junior represented both clients, adding: "And the minute order says Senior appeared, but whether Senior or Junior appeared, it doesn't really matter. Junior continues on both cases." We cannot conclude the May 13 minute order is substantial evidence that Junior aided and abetted Senior's unauthorized practice of law with respect to the Ochoas.

The evidence supported the jury's findings on counts 6 to 8. With respect to the Arizmendi, Alvarado, and Gutierrez matters, the evidence established that the clients, or the friends and family members assisting them, sought out Senior and believed they were primarily retaining Senior to work on their matters. Although Senior told some of the clients that Junior might make court appearances on their cases, he did not inform the clients that he was unable to do so because of his suspension, or that he could not lawfully work on their cases. Instead, Senior engaged in the false pretense that he was able to practice law. (*Miller, supra,* 81 Cal.App.4th at p. 1441 [" 'The false pretense may consist in any act, word, symbol, or token calculated and intended to deceive. It may be either express or implied from words or conduct. [Citations.]' [Citations.]"].) In reliance on this pretense, the clients or their families paid Senior money to represent them. As discussed above, Junior helped create this pretense and perpetuated it by appearing in court on Senior's cases, but otherwise leaving Senior to provide any other legal services required on the matters.

The jury could also reasonably infer that the victims relied on the false pretense that Senior was authorized to provide legal services to them, and they would not have hired him had they known of the suspension. Hinojosa met Senior at his house and was moved to retain him in part because of his experience, and his acquaintance with many important people, illustrated by photographs displayed in his house of him with various public figures. Corder and Landaverde sought out Senior based on a recommendation describing him as a "Latino Johnnie Cochran." Alvarado retained Senior a second time because he was familiar with the case, and based on her father's conversation with Senior. She had never spoken to Junior about the case. While Senior may have warned clients that Junior might appear in court on their matters, the deceit arose out of the false impression that Senior could remain responsible for the cases and involved in representing them.

However, we must reverse the conviction on count 9. As explained above, there was insufficient evidence for the jury to conclude Junior aided and abetted Senior in providing legal services to the Ochoas after his suspension began, or in holding himself

21

out as able to practice with respect to their cases. The evidence was that Junior assumed the representation of both Ochoas. There was no evidence that he suggested Senior would come back into the case to represent Emmanuel again. Although he gave a false reason for Senior's absence, there was no evidence the Ochoas transferred any property to the Rodriguez firm in reliance on the false statement that Senior could no longer represent Emmanuel because he was away, or busy on other matters. Further, when Senior and Junior first met with Vincent Ochoa in March 2009, Senior was authorized to practice law. There was no evidence that Junior knew, in March 2009, that Senior's bar membership would be suspended again, such that he would inevitably end up representing both Ochoa defendants.[10] Thus, we reverse the theft conviction as to count 9 only.

## III. There was Insufficient Evidence to Support the Conspiracy to Commit Capping Conviction as to Junior

Junior contends there was insufficient evidence for the jury to conclude he was involved in the capping conspiracy. We agree.

"A conspiracy is an agreement by two or more persons to commit any crime. (Pen. Code, § 182, subd. (a)(1); *People v. Morante* (1999) 20 Cal.4th 403, 416.) A conviction for conspiracy requires proof of four elements: (1) an agreement between two or more people, (2) who have the specific intent to agree or conspire to commit an offense, (3) the specific intent to commit that offense, and (4) an overt act committed by one or more of the parties to the agreement for the purpose of carrying out the object of the conspiracy. (Pen. Code, §§ 182, subd. (b), 184; *People v. Morante, supra,* 20 Cal.4th at p. 416; 1 Witkin & Epstein, Cal. Criminal Law (3d ed. 2000) Elements, § 68, p. 277.) [¶] The elements of conspiracy may be proven with circumstantial evidence,

---

**10** Gordon testified that on April 25, 2008, Senior was notified of the 2008 suspension, which began on May 25, 2008. No evidence was offered regarding when Senior was notified of the suspension which began on May 3, 2009. Senior met with Vincent Ochoa and his wife in March 2009. They signed a retainer agreement on March 31, 2009.

22

'particularly when those circumstances are the defendant's carrying out the agreed-upon crime.' [Citations.]  To prove an agreement, it is not necessary to establish the parties met and expressly agreed; rather, 'a criminal conspiracy may be shown by direct or circumstantial evidence that the parties positively or tacitly came to a mutual understanding to accomplish the act and unlawful design.' [Citation.]  [¶] . . .  Because there rarely is direct evidence of a defendant's intent, '[s]uch intent must usually be derived from all the circumstances of the attempt, including the defendant's actions.' [Citation.]" (*People v. Vu* (2006) 143 Cal.App.4th 1009, 1024-1025 (*Vu*).)

A "capper" is "any person . . . acting for consideration in any manner or in any capacity as an agent for an attorney at law or law firm . . . in the solicitation or procurement of business for the attorney at law or law firm . . . ." (Bus. & Prof. Code, § 6151, subd. (a).)  Business and Professions Code section 6152, subdivision (a)(1) makes it unlawful for any person to act as a capper "for any attorneys or to solicit any business for any attorneys in and about the state prisons, county jails, city jails, city prisons, or other places of detention of persons . . . superior courts, or in any public institution or in any public place or upon any public street or highway . . . or in and about any private institution or upon private property of any character whatsoever."  Under section 6152, subdivision (a)(2), it is unlawful for "[a]ny person to solicit another person to commit or join in the commission of a violation of subdivision (a)."

The evidence clearly indicated Revelez acted as a capper for the Rodriguez firm in violation of Business and Professions Code section 6152, subdivision (a)(1).  Multiple clients testified that Revelez approached them, handed them a flyer, and urged them to call the Rodriguez firm and tell them Revelez sent them.  However, there was no evidence that Junior had any involvement in the capping.  Revelez testified Senior gave him the materials to hand out.  Revelez also testified that Senior paid him.  The flyers were kept in Senior's office.  The office manager did not know who created the flyers.  Revelez said he had few or no conversations with Junior, and the office manager did not recall Revelez ever speaking with Junior.

There was some evidence that Junior accepted clients referred by Revelez. Yet, to establish criminal conspiracy, there must be at least circumstantial evidence of a tacit " 'understanding to accomplish the act and unlawful design.' " (*Vu, supra,* 143 Cal.App.4th at p. 1025.) " 'The gist of the crime of conspiracy . . . is the agreement or confederation of the conspirators to commit one or more unlawful acts . . .' [Citation.]" (*People v. Johnson* (2013) 57 Cal.4th 250, 266.) "[M]ere association and suspicion of criminal conduct is not enough to establish a conspiracy or even an agreement; there must be some evidence to demonstrate that the association is also a conspiracy." (*People v. Tran* (2013) 215 Cal.App.4th 1207, 1221.) "[S]imply knowing that a person's products or services are being used for a criminal purpose is insufficient." (*People v. Powers-Monachello* (2010) 189 Cal.App.4th 400, 419.)

Here, while Junior may have reaped benefits from the unlawful activity in the form of clients for the firm generally, or clients he personally agreed to represent, there was no evidence establishing, or even suggesting, that Junior participated in the capping, or in engaging Revelez to work as a capper for the firm. Although witnesses testified Revelez's flyers identified the Rodriguez firm, several also testified the business card he handed them displayed Senior's name, not Junior's. Moreover, there was no evidence of any association between Junior and Revelez, beyond their occasional presence in the same office. There was no evidence Junior knew about Revelez's and Senior's arrangements.

A defendant's mere acceptance of the benefits of a criminal activity after it has occurred is not necessarily evidence of the defendant's participation in a conspiracy to commit the crime. (See *People v. Hardeman* (1966) 244 Cal.App.2d 1, 52-53.) In this case, there was no evidence that Junior had any intent to use Revelez as a capper, or that he in any way intended to facilitate the capping Revelez conducted in association with Senior. Without any evidence that Junior had the requisite intent to commit unlawful capping, we must reverse the conspiracy conviction as to him.

**IV.    Any Error in the Court's Failure to Sua Sponte Instruct on Accomplice Testimony was Harmless**

Finally, Junior and Senior argue the trial court erred in failing to sua sponte instruct on accomplice testimony as to count 10 for conspiracy to commit capping. We find any error was harmless.[11]

"When a jury receives substantial evidence that a witness who has implicated the defendant was an accomplice, a trial court on its own motion must instruct it on the principles regarding accomplice testimony. [Citation.] This includes instructing the jury that an accomplice's testimony implicating the defendant must be viewed with caution and corroborated by other evidence. [Citations.] [¶] . . . [¶] An accomplice is someone subject to prosecution for the charged crimes by reason of aiding and abetting or being a member of a conspiracy to commit the charged crimes." (*People v. Houston* (2012) 54 Cal.4th 1186, 1223-1224.) Here Revelez was an accomplice but the court did not give an instruction on accomplice testimony.

However, even when accomplice instructions are necessary, but are not given, we will not find prejudice if the witness's testimony was sufficiently corroborated. (*People v. Boyer* (2006) 38 Cal.4th 412, 467.) " ' "Such [corroborative] evidence 'may be slight and entitled to little consideration when standing alone. [Citations.]' " [Citation.] "Corroborating evidence 'must tend to implicate the defendant and therefore must relate to some act or fact which is an element of the crime but it is not necessary that [such] evidence be sufficient in itself to establish every element of the offense charged.' [Citation.]" [Citation.]' [Citation.]" (*Ibid.*)

There was sufficient corroboration connecting Senior with the conspiracy to commit capping charge. Multiple clients testified they were approached by Revelez, who spoke favorably about the Rodriguez firm, then gave them a flyer or business card with Senior's contact information, along with instructions that the client should call, and say

---

[11]    In light of our reversal of Junior's conviction for conspiracy to commit capping, this issue is moot as to him. Our discussion regarding an accomplice testimony instruction applies only to Senior.

25

that Revelez sent them. Further, the office manager testified that Revelez passed out flyers for the firm, and the flyers were kept in Senior's office. Thus, any error in the trial court's failure to instruct on Revelez's accomplice testimony was harmless.

Moreover, it is not reasonably probable the result of the trial would have been different absent the error. The jury was made aware of several other reasons to view Revelez's testimony with caution, including his long criminal history, his self-admitted drug use during the relevant period which affected his recollections, and his hope that he would receive favorable treatment from the People in his own case if he testified.[12] These factors, combined with the corroboration of his testimony, indicate that any error was harmless. (*People v. Lawley* (2002) 27 Cal.4th 102, 161.)

## DISPOSITION

As to Stephen Adrian Rodriguez, the convictions on counts 5, 9, and 10 are reversed. The trial court is ordered to forward a copy of the corrected abstract of judgment to the Department of Corrections and Rehabilitation. In all other respects, the judgment is affirmed. As to Stephen Allan Rodriguez, the judgment is affirmed.


BIGELOW, P. J.


We concur:


FLIER, J.



GRIMES, J.

---

[12] On direct examination, the prosecutor elicited testimony from Revelez that he had asked her if there was any way she could give him a benefit for testifying, such as a reduced jail sentence, or a drug program. According to Revelez, the prosecutor told him she would not provide any such benefit.

26